## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MSP RECOVERY CLAIMS, SERIES LLC, a Delaware limited liability company; MAO-MSO RECOVERY II, LLC, SERIES PMPI, a Delaware limited liability company; and MSPA CLAIMS 1, LLC, a Florida limited liability company, | ) ) ) ) ) ) |
|       Plaintiffs, | ) ) |
| v. | ) ) |
| MALLINCKRODT ARD INC., a California corporation; MALLINCKRODT PLC, an Irish public limited company; EXPRESS SCRIPTS HOLDING COMPANY, a Delaware corporation; EXPRESS SCRIPTS, INC., a Delaware corporation; CURASCRIPT, INC., d/b/a CURASCRIPT, SD, a Delaware corporation; and UNITED BIOSOURCE LLC, a Delaware limited liability company, | ) ) ) ) ) ) ) ) ) ) ) |
|       Defendants. | ) ) |

## FIRST AMENDED
## CLASS ACTION COMPLAINT

Plaintiffs, MSP RECOVERY CLAIMS, SERIES LLC, a Delaware limited liability company; MAO-MSO RECOVERY II, LLC, SERIES PMPI, a Delaware limited liability company; and MSPA CLAIMS 1, LLC, a Florida limited liability company (collectively "Plaintiffs"), on behalf of themselves and the Class described herein, bring this action against MALLINCKRODT ARD INC., a California corporation, MALLINCKRODT PLC, an Irish public limited company, (collectively "Mallinckrodt"); EXPRESS SCRIPTS HOLDING COMPANY, a Delaware corporation, EXPRESS SCRIPTS, INC., a Delaware corporation; CURASCRIPT, INC. d/b/a CURASCRIPT, SD, ("CuraScript"); and UNITED BIOSOURCE LLC, a Delaware limited

1

liability company, ("UBC") (collectively "Express Scripts"), (collectively "Defendants") and allege as follows:

## NATURE OF THE ACTION

1.     Plaintiffs are assignees of recovery rights originally held by Medicare Advantage ("MA") Plans, including Medicare Advantage Organizations, Health Maintenance Organizations, Management Service Organizations, Independent Physician Associations, and other Medicare first tier and downstream entities, all of whom act as third party payers, providing Medicare benefits to their beneficiaries. (These entities are generally referred to herein as "Medicare Advantage Plans" or "MA Plans"). Plaintiffs bring this action to challenge Defendants' monopolistic and anti-competitive pricing scheme for the drug H.P. Acthar Gel ("Acthar").

2.     Mallinckrodt manufactures, markets, distributes and sells Acthar, currently identified by the National Drug Code ("NDC") No. 63004871001. Acthar is an adrenocorticotropic hormone ("ACTH") used to treat rare illnesses, including but not limited to infantile spasms in children under two years of age, multiple sclerosis, nephrotic syndrome and rheumatology related conditions (e.g., collagen diseases). Acthar currently is the only ACTH product sold in the United States ("U.S.").

3.     Mallinckrodt acquired its Acthar monopoly in 2001 when its predecessor Questcor purchased Acthar from Aventis Pharmaceuticals, Inc. ("Aventis") for $100,000.

4.     Questcor subsequently contracted with Express Scripts to distribute Acthar. Since 2007, Acthar has been exclusively distributed by Express Scripts and its wholly-owned subsidiary, CuraScript. Acthar prescriptions are obtained through the "Acthar Support & Access Program," which is managed by UBC.

5.     Defendants have engaged in egregious price-gouging, taking advantage of the fact that people have no other choices besides Achtar and that parents will pay almost anything to save the life of a child. In 2001, when Questcor acquired Acthar, the average cost was $40.00 per vial. Prior to Express Scripts becoming the exclusive distributor of Acthar, the price per vial was $1,980.00. After the contract with Express Scripts was signed, the price per vial was increased to over $27,927.80. Today, a vial of Acthar costs over $43,000.00, amounting to an 107,400% increase in price since 2001. As discussed below, Defendants were able to take advantage of consumers, government payers, and private payers by deliberately shelving a low cost synthetic competing drug, while increasingly raising the price of Acthar, the only ACTH on the market.

6.     Between 2013 and 2017, Plaintiffs' Assignors paid $125,550,620.09 on Acthar prescriptions for their beneficiaries.

7.     As alleged in greater detail below, the Defendants' monopolistic and anti-competitive behavior, which has allowed them to drastically increase the cost of Acthar, has violated numerous federal and state antitrust and consumer protection laws.

8.     Defendants behavior has caused third-party payers, including Plaintiffs' Assignors, to overpay for Acthar on behalf of thousands of individual beneficiaries throughout the U.S., including Illinois.

9.     Therefore, this action seeks damages, damage multipliers, and injunctive relief under federal antitrust, state antitrust, and consumer protection laws to put an end to this anti-consumer behavior.

## JURISDICTION AND VENUE

10.     Plaintiffs bring Count One of this action under Section 16 of the Clayton Act (15 U.S.C. § 26) for injunctive relief and costs of suit, including reasonable attorneys' fees against

3

Defendants for the injuries sustained by Plaintiffs and the members of the Class described herein by reason of the violations of Sections 1, 2, and 3 of the Sherman Act (15 U.S.C. §§§ 1, 2, 3).

11.    Jurisdiction is conferred upon this Court by 18 U.S.C. § 1331 and § 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26). In addition, jurisdiction is also conferred upon this Court by 28 U.S.C. § 1367.

12.    This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d), because at least one member of the class is a citizen of a state different from the Defendants and the amount in controversy exceeds $5,000,000.00 exclusive of interest and costs.

13.    Venue is proper in this District pursuant to to 15 U.S.C. § 15(a) and 22 and 28 U.S.C. §§ 1391(b), (c), and (d) because during the Class Period (August 1, 2007 to the Present), Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity affecting interstate trade and commerce, discussed below, has been carried out in this District.

14.    Acthar is sold and distributed throughout the U.S. and the unlawful activities alleged in this Complaint have occurred in and have had a substantial effect on interstate commerce.

## THE PARTIES

15.    Plaintiff MSP RECOVERY CLAIMS, SERIES LLC, is a Delaware limited liability company with its principal place of business located at 2701 S. Le Jeune Rd., Coral Gables, Florida 33134. One or more MA Plans irrevocably assigned to this Plaintiff the right to assert the causes of action alleged in this Complaint. Because of the assignment or assignments, Plaintiff is empowered to recover the cost of Acthar payments made on behalf of the assignors' beneficiaries

for which Defendants are liable. As alleged below, various assignments have been allocated to specific numbered entities within MSP RECOVERY CLAIMS, SERIES LLC.

16.     Series 16-11-509 is a series of MSP Recovery Claims, Series LLC. Series 16-11-509 is a Delaware designation for the holdings of SummaCare, Inc. ("SummaCare").

17.     Series 16-08-483 is a series of MSP Recovery Claims, Series LLC. Series 16-08-483 is a Delaware designation for the holdings of EmblemHealth Services Company, LLC ("Emblem").

18.     Series 15-09-157 is a series of MSP Recovery Claims, Series LLC. Series 15-09-157 is a Delaware designation for the holdings of ConnectiCare, Inc. ("ConnectiCare").

19.     Series 15-08-25 is a series of MSP Recovery Claims, Series LLC. Series 15-08-25 is a Delaware designation for the holdings of University Health Care MSO, Inc. ("UNHC").

20.     Series 15-12-404 is a series of MSP Recovery Claims, Series LLC. Series 15-12-404 is a Delaware designation for the holdings of Alianza Profesional de Cuidado Medico ("APCM").

21.     Plaintiff MSPA CLAIMS 1, LLC, is a Florida limited liability company, with its principal place of business located at 2600 S. Douglas Rd., Suite 1008, Coral Gables, Florida 33134. One or more MA Plans irrevocably assigned to this Plaintiff the right to assert the causes of action alleged in this Complaint. Because of the assignment or assignments, Plaintiff is empowered to recover the cost of Acthar payments made on behalf of the assignors' beneficiaries for which Defendants are liable.

22.     Plaintiff, MAO-MSO RECOVERY II, LLC, SERIES PMPI, is a Delaware limited liability company with its principal place of business at 45 Legion Drive, Cresskill, New Jersey 07626. One or more MA Plans irrevocably assigned to this Plaintiff the right to assert the causes

of action alleged in this Complaint. Because of the assignment or assignments, Plaintiff is empowered to recover the cost of Acthar payments made on behalf of the assignors' beneficiaries for which Defendants are liable.

23.     Defendant MALLINCKRODT PLC, is an Irish public limited company, with its corporate headquarters in Staines-upon-Thames, United Kingdom. Its principal executive offices are located at 3 Lotus Park, the Causeway, Staines-upon-Thames, Surrey, TW18 3 AG.

24.     Mallinckrodt PLC purchased Questcor Pharmaceuticals ("Questcor") on August 14, 2014 for $5.9 billion. At the time of acquisition, Acthar was essentially the only product sold by Questcor. With Mallinckrodt PLC's acquisition, Questcor became a wholly-owned subsidiary of Mallinckrodt PLC and its name was changed to Mallinckrodt ARD, Inc.

25.     For clarity where necessary, the entity that existed prior to the Mallinckrodt acquisition in 2007 will be referred to as Questcor.

26.     Defendant MALLINCKRODT ARD, INC., is a California corporation with its principal place of business at 675 McDonnell Blvd., Hazelwood, Missouri 63042.

27.     Mallinckrodt PLC and Mallinckrodt ARD, Inc. are collectively referred to as "Mallinckrodt." Mallinckrodt will be used when discussing actions by the manufacturer of Acthar after the 2014 acquisition of Questcor.

28.     Defendant EXPRESS SCRIPTS HOLDING COMPANY, is a Delaware corporation with its principal place of business at 1 Express Way, St. Louis, Missouri 63121.

29.     Defendant EXPRESS SCRIPTS, INC., is a Delaware corporation with its principal place of business at 1 Express Way, St. Louis, Missouri 63121.

30.     Collectively Express Scripts Holding Company and Express Scripts, Inc. are referred to as "ESI."

31.     ESI is one of the largest Pharmacy Benefit Managers ("PBM") in the U.S., with a market share of approximately 24%.

32.     Defendant, CURASCRIPT, INC., d/b/a CuraScript, SD, f/k/a CuraScript Pharmacy, Inc. ("CuraScript") is a Delaware corporation with its principal place of business at 255 Technology Park, Lake Mary, Florida 32746.

33.     CuraScript is a specialty distribution company and a wholly-owned subsidiary of ESI. ESI acquired CuraScript in January 2004. In October 2005, ESI acquired Priority Healthcare Corporation, a large specialty pharmacy and distribution company. With the addition of Priority Healthcare Corporation, CuraScript became one of the largest specialty pharmacy and distribution companies in the U.S., with over $3 billion in annual revenue.

34.     Defendant UNITED BIOSOURCE, LLC f/k/a United BioSource Corporation ("UBC"), is a Delaware limited liability company with its principal place of business at 920 Harvest Drive, Blue Bell, Pennsylvania 19422.

35.     UBC provides pharmaceutical and patient support services and was a wholly-owned subsidiary of ESI acquired in the 2012 purchase of Medco. UBC was purchased by Avista Capital Partners, a private equity firm in November 2017.

36.     ESI, CuraScript, and UBC are collectively referred to as "Express Scripts."

37.     Mallinckrodt and Express Scripts are collectively referred to as "Defendants."

**INTRODUCTION TO PLAINTIFFS' ASSIGNORS:**
**THIRD PARTY PAYERS THAT ARE MEDICARE ADVANTAGE PLANS**

38.     As stated above, Plaintiffs' assignors are MA Plans. With regard to the allegations herein, MA Plans operate like any third party payer: providing payment for medical items and services for their beneficiaries. This section is provided to introduce and clarify the types of MA Plans.

7

I.       **Medicare Advantage Plans**

39.      Medicare benefits are divided into four parts. Medicare Part A, 42 U.S.C. § 1395c, *et seq.*, provides coverage for costs of inpatient hospital services and is available without payment of premiums to most persons who paid Medicare payroll taxes prior to becoming Medicare-eligible. Medicare Part B, 42 U.S.C. § 1395j, *et seq.*, funded through premiums and general tax revenue, is a voluntary program in which the beneficiary pays premiums to Medicare, and in return Medicare pays the costs of his or her medically-necessary outpatient services, such as doctors' office visits. Medicare Part C, 42 U.S.C. § 1395w-21(a)(1), *et seq.*, permits individuals eligible for Medicare to elect to receive their Medicare benefits through enrollment in an MA Plan. Medicare Part D, 42 U.S.C. § 1395w-101 *et seq.*, provides voluntary prescription drug coverage to Medicare enrollees.

A.       **Medicare Advantage Organizations**

40.      Medicare Advantage Organizations ("MAOs")[1] enter into contracts with the Centers for Medicare and Medicaid Services ("CMS") to administer and provide the same benefits under traditional Medicare. 42 U.S.C. §§ 1395w-21, 1395w-23. Pursuant to this contract, MAOs receive a fixed payment from CMS for each enrollee. MAOs do not issue a Medicare "insurance policy" but, rather, send out a document describing the Medicare benefits that beneficiaries receive. They do not pay benefits pursuant to a "policy," but rather under a statutory framework. Thus, MAOs pay healthcare providers directly for the care received by Part C beneficiaries. If the

---

[1] Consistent with the Medicare Advantage statuory terminology and framework, Plaintiffs refer to "MA Plans" as inclusive of *all* entities described herein that provide benefits to enrolled beneficiaries. "MAOs" are the subset of MA Plans that contract directly with CMS, as described in this paragraph.

costs of this care exceed the fixed payment received from the government, the MAO assumes the risk and cost. Some Health Maintenance Organizations ("HMOs") are also MAOs.

41.     To become an MAO, a private insurer must enter a bidding process, meeting certain requirements set by CMS. Additionally, in providing the basic benefits offered to traditional Medicare beneficiaries, MAOs must abide by coverage determinations provided by CMS and all coverage disputes between beneficiaries and MAOs must go through the traditional Medicare appeals process. CMS sets the fixed rate at which MAOs will be remunerated per enrollee and establishes services the MAO must provide.

42.     Currently, there are over 16 million individuals enrolled in MA Plans nationwide. More than 37 million individuals are enrolled in Medicare prescription drug plans, either on a stand-alone basis or in connection with an MA Plan.

**B.      First-Tier and Downstream Entities**

43.     A first-tier entity is any party that enters into a written arrangement with an MAO, acceptable to CMS, to provide administrative or health care services for a Medicare-eligible individual under the MA program. 42 C.F.R. § 422.2; *see also Medicare Managed Care Manual*, Ch. 11 (Rev. 83, 04-25-07).

44.     A downstream entity is any party that enters into a written arrangement, acceptable to CMS, with persons or entities involved with the MA benefit, below the level of the arrangement between an MAO (or applicant) and a first-tier entity. *See* 42 C.F.R. § 422.2.

45.     First-tier and downstream entities administer and provide Medicare services to the enrollees. The first-tier and downstream entities bear the full risk of loss pursuant to their contractual obligation with MAOs.

46.     First-tier and downstream entities include Management Service Organizations ("MSOs") and Independent Physician Associations ("IPAs").

## II.     Medicare Prescription Drug Coverage

47.     Medicare does not offer its beneficiaries prescription drug coverage directly. Instead, prescription drug coverage is an optional benefit. Prescription drug benefits are provided by insurance companies and other private companies approved by Medicare ("Part D").

48.     Medicare beneficiaries have two options for obtaining Part D prescription drug coverage, (1) through their MA Plan that offers Part C benefits as well as prescription coverage; or (2) through a separate Medicare Prescription Drug Plan.

49.     Generally, MA Plans that offer Part C benefits include prescription drug benefits. In fact, an MA Plan that offers prescription drug coverage can disenroll a beneficiary if the beneficiary enrolls in a separate Part D plan instead of using the MA Plan's drug coverage.

50.     Plans that provide Part D coverage must provide qualified prescription drug coverage which includes "standard prescription drug coverage" or "alternative prescription drug coverage" with at least actuarially equivalent benefits.

51.     Part D has different stages of cost sharing until a beneficiary reaches a set limit on out-of-pocket costs for the year. For 2019, the limit on out-of-pocket costs is $5,100.00.[2] After that, the MA Plan pays most of the costs for the drug throughout the remainder of the year.

---

[2] *Catastropic Coverage*, Medicare.gov, https://www.medicare.gov/drug-coverage-part-d/costs-for-medicare-drug-coverage/catastrophic-coverage

52.     MA Plans may require a deductible be met prior to paying for drug coverage. In 2019, the maximum deductible a beneficiary can be charged is $415.00.[3]  During the deductible stage, the beneficiary pays all costs for their prescriptions.

53.     Once the deductible is met, the initial coverage period begins. During this period, the beneficiary pays a portion of the drug's cost and the MA Plan pays the remainder. The amount paid by the beneficiary will be either a copayment or coinsurance. A copayment is a set amount for all drugs based on what tier the drug falls into on the MA Plan's drug formulary (e.g., $50 for brand-name drugs on Tier 1, $25 for brand-name drugs on Tier 2). With coinsurance, a beneficiary will pay a percentage of the cost (e.g. 25%) of the drug.

54.     Most Part D plans have a coverage gap called the "donut hole" wherein there is a temporary limit on what the Part D plan will cover. The coverage gap begins after the beneficiary and MA Plan have paid a certain amount for covered drugs. In 2019, once the cost has reached $3,820.00 spent on prescriptions, a beneficiary will enter the coverage gap.[4]

55.     During the coverage gap, the beneficiary pays 25% of the price for brand-name drugs and the MA Plan pays 75%. For generic drugs, the MA Plan pays 63% of the price and beneficiary pays 37%.[5]

56.     Once the beneficiary and MA Plan have spent $5,100.00, the beneficiary is out of the coverage gap. Once out of the coverage gap the beneficiary automatically gets "catastrophic coverage." This means the beneficiary only pays their copayment or coinsurance amount for the rest of the year.

---

[3] *Yearly Deductible for Drug Plans*, Medicare.gov, https://www.medicare.gov/drug-coverage-part-d/costs-for-medicare-drug-coverage/yearly-deductible-for-drug-plans

[4] *Costs in the Coverage Gap*, Medicare.gov, https://www.medicare.gov/drug-coverage-part-d/costs-for-medicare-drug-coverage/costs-in-the-coverage-gap

[5] Id.

"Medicare Made Clear, Part D Coverage & Costs," UnitedHealthcare (May 8, 2018), https://www.medicaremadeclear.com/basics/medicare-coverage-and-costs/medicare-part-d (last visited March 15, 2019).

57.    Because of the high cost of Acthar, a Part D beneficiary reaches the catastrophic coverage stage after one prescription. Therefore, the MA Plan bears the brunt of the cost of Acthar for the entire year.

**STANDING**

58.    Plaintiffs hold irrevocable assignments of recovery rights from numerous MA Plans, collectively referred to as "Assignors" herein.

59.    Plaintiffs allege the following exemplar assignments to establish standing.

60.    On May 12, 2017, SummaCare irrevocably assigned all rights, title, interest in and ownership of Medicare Recovery Claims to MSP Recovery, LLC ("SummaCare Recovery Agreement").

61.    The SummaCare Recovery Agreement is attached hereto as **Exhibit A**[6], and expressly provides:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims"… This assignment is irrevocable and absolute.

**Ex. A**, at 1-2.

62.    That same day, SummaCare executed a stand-alone assignment, attached hereto as **Exhibit B**, which states:

> Client hereby irrevocably assigns, transfers, and sets over to MSP Recovery, and any of its successors and assigns, for purposes of collection, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, including but not limited to Medicare Secondary Payer Act, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to Claims, including claims under consumer protection statutes and laws, and all information relating thereto, for claims payments made for or on behalf of beneficiaries, members and enrollees arising from dates of service beginning January 1, 2009 up to and including May 12, 2017, all of which shall constitute the "Assigned Claims"… This assignment is irrevocable and absolute.

**Ex. B**, at 1-2.

63.    Thereafter, on June 12, 2017, MSP Recovery LLC irrevocably assigned all rights under the SummaCare Assignment to Series 16-11-509, a series of MSP Recovery Claims, Series

---

[6] Plaintiffs have redacted confidential business information from all the assignment agreements.

LLC ("Series 16-11-509 Assignment"). The Series 16-11-509 Assignment is attached hereto as

**Exhibit C** and states:

> Assignor … irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the "Assigned Claims", "Claims", "Assigned Assets" and "Assigned Documents"…as such terms are defined in the Recovery Agreement dated May 12, 2017, by and among SummaCare, Inc. … and MSP Recovery, LLC … irrespective of when the claims were vested in Client, inclusive of any and all claim(s), causes of actions, proceeds, products and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party pursuant to the Agreement, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims and all information relating thereto.

**Ex. C**, at 1.

64.     From 2013 to 2017, SummaCare spent approximately $2,323,404.98 on Acthar

prescriptions for its beneficiaries.[7]

65.     On May 3, 2016, Preferred Medical Plan, Inc. ("PMPI") irrevocably assigned all

rights, title, interest in and ownership of Medicare Recovery Claims to MSP Recovery, LLC

("PMPI Recovery Agreement").

66.     The PMPI Recovery Agreement is attached hereto as **Exhibit D**, and expressly

provides:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to subrogation) to pursue and/or recover monies for Client that Client had,

---

[7] The amounts Plaintiffs' Assignors allege herein are meant to be used merely to allege damages. These figures are derived from a single NDC code found throughout Plaintiffs claims data and records. Acthar has had multiple NDC codes that have been deemed inactive during the class period. Discovery will reveal if multiple NDC codes are associated with the schemes alleged herein.

14

may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto … The Assignment shall be complete and irrevocable.

**Ex. D,** § 3.1.

67.    Thereafter, on August 8, 2016, MSP Recovery, LLC irrevocably assigned all rights under the PMPI Recovery Agreement to MAO-MSO Recovery II, LLC, Series PMPI ("MAO-MSO Assignment"). The MAO-MSO Assignment is attached as **Exhibit E** and states:

> Assignor hereby irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, all of Assignor's right, title, ownership and interest in and to all Assigned Claims, plus all proceeds, products and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the Assigned Claims, and all rights and claims against primary payers and/or third parties that may have had, or has asserted against any party in connection with the Assigned Claims, and all rights and claims against primary payers and/or third parties that may be liable to Assignor arising from or relating to the Assigned Claims, including claims under consumer protection statutes and laws, and all information relating thereto, of which shall constitute the "Assigned Claims".

**Ex. E**, § 1.1.

68.    From 2013 to 2017, PMPI spent approximately $193,950.00 on Acthar prescriptions for its beneficiaries.

69.    On June 25, 2015, Professional Health Choice ("PHC") irrevocably assigned all rights, title, interest in and ownership of Medicare Recovery Claims to MSPA Claims XI, LLC ("PHC Recovery Agreement").

70.    The PHC Recovery Agreement is attached hereto as **Exhibit F**, and expressly provides:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSPA Claims, or its assigns, any and all of Client's right, title, ownership and

interest in and to all rights and entitlements, that Client has, may have had, or has asserted against any party including primary payors and/or third parties that may be liable to Client arising from or relating to the Claims related to services and/or supplies.

**Ex. F**, § 1.1.

71.    Thereafter, MSPA Claims XI, LLC irrevocably assigned all rights, title, interest in and ownership of Medicare Recovery Claims to MSP Recovery Services, LLC ("MSPA Claims XI Assignment"), the assignment stating:

> Assignor hereby irrevocably assigns, transfers, conveys, sets over, and delivers to Assignee or its assigns any and all of Assignor's right, title, ownership and interest in and to all rights and entitlements, that Assignor has, may have had, or has asserted against third parties arising from or relating to only the Claims set forth in Services Entities Schedule 2 attached hereto.

72.    That same day, MSP Recovery Services, LLC irrevocably assigned all rights, title, interest in and ownership of Medicare Recovery Claims to MSPA Claims 1, LLC, stating:

> Assignor hereby irrevocably assigns, transfers, conveys, sets over, and delivers to Assignee or its assigns any and all of Assignor's right, title, ownership and interest in and to all rights and entitlements, that Assignor has, may have had, or has asserted only as specifically delineated in the assignment agreement attached hereto as Item 1.

73.    Thereafter, MSPA Claims XI, LLC irrevocably assigned all rights under the PHC Recovery Agreement to MSPA Claims 1, LLC ("PHC Assignment") The PHC Assignment is states:

> Assignor … irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to all rights and entitlements, that Assignor has, may have had, or has asserted against any party including primary payors and/or third parties that may be liable to Assignor arising from or relating to the Claims … in the Claims Cost Recovery Agreement and Assignment of Claims and Causes of Action dated June 25, 2015 … irrespective of when the claims were vested in Client, inclusive of any and all causes of action, claims and demands of whatsoever nature, proceeds, products and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies

that Assignor had, may have had, or has asserted against any party pursuant to the Agreement, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims and all information relating thereto.

74.     From 2013 to 2017, PHC spent approximately $938,384.80 on Acthar prescriptions for its beneficiaries.

75.     On March 20, 2018, Emblem irrevocably assigned all rights, title, interest in and ownership of Medicare Recovery Claims to Series 16-08-483, a designated series of MSP Recovery Claims, Series LLC, and MSP Recovery, LLC ("Emblem Assignment Agreement").[8]

76.     The Emblem Assignment Agreement is attached hereto as **Exhibit G** and expressly provides:

> Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its successors and assigns, any and all of Assignor's right, title, ownership, and interest in and to all Assigned Medicare Recovery Claims, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the Assigned Medicare Recovery Claims and all rights and Claims against primary payers and/or…third parties that may be liable to Assignor arising from or relating to the Assigned Medicare Recovery Claims, including claims under consumer protection statutes and laws, and all information relating thereto, as may be applicable. … The assignment is irrevocable and absolute.

**Ex. G**, § 2(b).

77.     Thereafter, on April 4, 2018, MSP Recovery LLC, irrevocably assigned all rights under the Emblem Assignment Agreement to Series 16-08-483 ("Series 16-08-483 Assignment"). The Series 16-08-483 Assignment is attached as **Exhibit H** and states:

> MSP Recovery, LLC … hereby irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee, Series 16-08-483, … and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the "Assigned

---

[8] The Assignment Agreement included the assignment of rights for Health Insurance Plan of Greater New York and Group Health Incorporated (Emblem subsidiaries). All three parties were signatories to the Assignment Agreement.

Claims", "Claims", "Assigned Assets", "Assigned Medicare Recovery Claims" and
"Assigned Documents" (and all proceeds and products thereof) as such terms may
be defined in the March 20, 2018 Assignment Agreement, irrespective of when the
claims were vested, inclusive of any and all claim(s), causes of actions, proceeds,
products and distributions of any kind, and proceeds of proceeds, in respect thereof,
whether based in contract, tort, statutory right, and any and all rights (including, but
not limited to, subrogation) to pursue and/or recover monies that EmblemHealth
Services Company, LLC, Group Health Incorporated and Health Insurance Plan of
Greater New York, including claims under consumer protection statutes and laws,
any and all rights and claims against primary payers and/or third parties that may
be liable to them arising from or relating to the Claims and all information relating
thereto.

**Ex. H**, at 1.

78.     From 2013 to 2017, Emblem spent approximately $35,854,853.98 on Acthar

prescriptions for its beneficiaries.

79.     On March 20, 2018, ConnectiCare irrevocably assigned all rights, title, interest in

and ownership of Medicare recovery claims to Series 15-09-157, a designated series of MSP

Recovery Claims, Series LLC and MSP Recovery, LLC ("ConnectiCare Assignment").

80.     The ConnectiCare Assignment is attached hereto as **Exhibit I**, and expressly

provides:

Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to
Assignee, and any of its successors and assigns, any and all of Assignor's right,
title, ownership, and interest in and to all Assigned Medicare Recovery Claims,
whether based in contract, tort, statutory right, and any and all rights (including, but
not limited to, subrogation) to pursue and/or recover monies that Assignor had, may
have had, or has asserted against any party in connection with the Assigned
Medicare Recovery Claims and all rights and Claims against primary payers and/or
… third parties that may be liable to Assignor arising from or relating to the
Assigned Medicare Recovery Claims, including claims under consumer protection
statutes and laws, and all information relating thereto, as may be applicable. This
Assignment includes all of Assignor's right, title, and interest in and to the
Assignor's any legal or equitable actions, rights, causes of action or lawsuits of any
nature whatsoever, arising out of or in connection with the Assigned Medicare
Recovery Claims. … The assignment is irrevocable and absolute.

**Ex. I**, at 2.

81.     Thereafter, on April 4, 2018, MSP Recovery, LLC irrevocably assigned all rights under the ConnectiCare Assignment to Series 15-09-157 ("Series 15-09-157 Assignment"). The Series 15-09-157 Assignment is attached hereto as **Exhibit J** and states:

> MSP Recovery, LLC … hereby irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee, Series 15-09-157 … and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to all assigned Subject Medicare Recovery Claims inclusive of any and all claim(s), causes of actions, proceeds, products and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party pursuant to the Assignment Agreement and in connection with the assigned Subject Medicare Recovery Claims and all rights and claims against primary payers and/or third parties that may be liable to Assignor arising from or relating to the assigned Subject Medicare Recovery Claims, including claims under consumer protection statutes and laws, and all information relating thereto, as may be applicable as such terms may be defined in the March 20, 2018 Assignment Agreement, irrespective of when the claims were vested.

**Ex. J,** at 1.

82.     From 2013 to 2017, ConnectiCare spent approximately $27,692,937.30 on Acthar prescriptions for its beneficiaries.

83.     On November 23, 2015, UNHC irrevocably assigned all rights, title, interest in and ownership of Medicare Recovery Claims to MSP Recovery, LLC ("UNHC Recovery Agreement").

84.     The UNHC Recovery Agreement is attached hereto as **Exhibit K**, and expressly provides:

> Client hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims"). This includes, but is not limited to, primary payors and/or third parties that may be liable to Client arising from or relating to the Assigned Claims.

**Ex. K**, § 4.1.

19

85.     Thereafter, on June 12, 2017, MSP Recovery LLC irrevocably assigned all rights under the UNHC Recovery Agreement to Series 15-08-25, LLC, a designated series of MSP Recovery Claims, Series LLC. ("Series 15-08-25 Assignment"). The Series 15-08-25 Assignment is attached hereto as **Exhibit L** and states:

> Assignor … irrevocably assigns, sells, transfers, conveys sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the "Assigned Claims", "Claims", "Assigned Assets", and "Assigned Documents" (and all proceeds and products thereof) as such terms are defined in … Recovery Agreement dated November 23, 2015…irrespective of when the claims were vested in Client, inclusive of any and all claim(s), causes of actions, proceeds, products and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party pursuant to the Agreement, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims and all information relating thereto.

**Ex. L**, at 1.

86.     From 2013 to 2017, UNHC spent approximately $550,871.00 on Acthar prescriptions for its beneficiaries.

87.     On, December 10, 2015, APCM irrevocably assigned all rights, title, interest in and ownership of Medicare Recovery Claims to MSP Recovery 15-627, LLC ("APCM Recovery Agreement").

88.     The APCM Recovery Agreement is attached hereto as **Exhibit M**, and expressly provides:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, in perpetuity, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information and data used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party including, but not limited to, primary payors and/or third parties that may be liable to Client arising from or relating to the Assigned Claims.

20

**Ex. M**, § 1.1.

89.     Thereafter, on June 12, 2017, MSP Recovery 15-627, LLC irrevocably assigned all rights under the APCM Recovery Agreement to Series 15-12-404 LLC, a designated series of MSP Recovery Claims, Series LLC.   ("Series 15-12-404 Assignment"). The Series 15-12-404 Assignment is attached hereto as **Exhibit N** and states:

> Assignor … irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the "Assigned Claims", "Claims", "Assigned Assets", and "Assigned Documents" (and all proceeds and products thereof) as such terms are defined in … Recovery Agreement dated December 10, 2015…irrespective of when the claims were vested in Client, inclusive of any and all claim(s), causes of actions, proceeds, products and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party pursuant to the Agreement, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims and all information relating thereto.

**Ex. N**, at 1.

90.     From 2013 to 2017, APCM spent approximately $686,560.20 on Acthar prescriptions for its beneficiaries.

## FACTUAL ALLEGATIONS

### The Pharmaceutical Supply Chain

**I.     Drug Distribution**

91.     The traditional pharmaceutical supply chain in the U.S. consists of four major actors: drug manufacturers, wholesale distributors, pharmacies (retail, mail-order, and specialty), and PBMs.

92.     Drug manufacturers manage the distribution of drugs from their manufacturing facilities to wholesale distributors, and sometimes, directly to retail pharmacy chains, mail-order and specialty pharmacies, hospitals and some health plans.

93.     Usually, wholesale distributors purchase the pharmaceutical product from the manufacturer and distribute them to customers, including retail and mail-order pharmacies. However, wholesale distributors can also offer specialized services such as specialty drug distribution.

94.     Most pharmacies purchase drugs from the wholesale distributor, although some pharmacies such as specialty and mail-order pharmacies, often purchase directly from the manufacturer.

95.     More often than not, patients then purchase their prescriptions directly from their pharmacy of choice.

## II.     Drug Pricing

96.     Manufacturers have the most control over the price of their drugs. The manufacturers establish a "wholesale acquisition cost" ("WAC"). After the WAC is established, the "average wholesale price" ("AWP"), or the list price, is established by the manufacturer or a company that publishes a price compendium.

97.     The AWP is used by some public and private third-party payers as a basis for reimbursement (e.g., AWP minus 5 or 25 percent) and it often serves as the base price for negotiations between manufacturers and private sector purchasers of drugs.

98.     The AWP is used by Plaintiffs' Assignors and all Part D sponsors to calculate payment amounts.

99.     There is also the "average sales price" ("ASP") which is the weighted average of all non-Federal sales to wholesaler distributors net of chargebacks, discounts, rebates, and other benefits tied to the purchase of a drug, whether it is paid to the wholesaler or retailer. The ASP is the basis for reimbursement for products covered under Medicare Part B.

100.     Retail pharmacies negotiate with manufacturers for discounts and rebates based on the pharmacies' ability to sell specific volumes of the drug or to achieve a certain share of the market.

101.     Pharmacies will negotiate and contract with PBMs to be included in the PBM's pharmacy network and for reimbursement for the cost of the drug plus dispensing fees. The pharmacy network consists of a group of retail and independent pharmacies that offer plan members lower prescription drug costs. As part of the contract, pharmacies must agree to a guaranteed reimbursement formula for prescription drugs. For brand-name medication, the reimbursement formula is usually determined by subtracting a negotiated percentage from the drug's AWP and adding the dispensing fee.

102.     Specialty pharmacies serve patients with chronic or rare diseases by dispensing high-cost biotechnology drugs. Most specialty pharmacy providers manage the costs of specialty drugs by negotiating directly with manufacturers and by running quality-focused programs intended to lower costs. Large PBMs often own pharmacies and in some cases these entities are able to negotiate greater discounts with manufacturers.

103.     PBMs like Express Scripts contract with third-party payers, (e.g., MA Plans) to provide a range of services such as developing the drug formulary (the list of drugs included in coverage at various pricing "tiers"), processing claims, creating a network of retail pharmacies,

and negotiating drug prices. Most third-party payer and PBM contracts require the PBM to provide cost-containment (i.e., control the cost of drugs for the third-party payer's beneficiaries).

104.    As discussed in detail below, the sale and distribution of Acthar deviated from the traditional pharmaceutical supply chain. As a result, Plaintiffs' Assignors paid more for Acthar than they would have had the Defendants not manipulated the marketplace by limiting the distribution of Acthar and purchasing the only potential competitive drug. These actions allowed Defendants to maintain a monopoly for Acthar which allowed them to drastically increase the cost of the drug.

**History of Acthar**

105.    Acthar was first developed by the Mayo Clinic, a division of Armour Pharmaceutical Company, in 1948.

106.    Acthar is an adrenocorticotrophic hormone ("ACTH"), which stimulates the adrenal cortex to secrete cortisol, corticosterone, aldosterone, and other androgenic substances.

107.    Acthar was approved by the U.S. Food and Drug Administration ("FDA") on April 29, 1952, as a slow-release injectable form of ACTH for the treatment of over fifty conditions. This approval was prior to the Kefauver Harris Amendment of 1962, which required drug manufacturers to provide proof of efficacy as well as safety.

108.    Acthar is currently approved for nineteen indications.[9]

---

[9] Acthar is approved for the following indications: (1) monotherapy for the treatment of infantile spasms in infants and children under 2 years of age; (2) treatment of acute exacerbations of multiple sclerosis in adults; adjunctive therapy for short-term administration in: (3) psoriatic arthritis; (4) rheumatoid arthritis; (5) ankylosing spondylitis; during an exacerbation or as maintenance therapy in select cases of (6) systemic lupus erythematosus, (7) systemic dermatomyositis (polymyositis); (8) severe erythema multiforme; (9) Stevens-Johnson syndrome; (10) serum sickness; severe acute and chronic allergic and inflammatory processes involving the eye and its adnexa such as (11) keratitis; (12) iritis, (13) iridocyclitis, (14) diffuse posterior uveitis, (15) choroiditis, (16) optic neuritis, (17) anterior segment inflammation; (18) symptomatic

109.    Of the nineteen indications, Mallinckrodt generates most of its revenue from Acthar through prescriptions for infantile spasms ("IS"), multiple sclerosis, nephrotic syndrome and rheumatology related conditions (e.g., collagen diseases).

110.    Rhone-Poulenc Rorer (merged with Hoechst AG to form Aventis which subsequently merged with Sanofi) acquired the rights to Acthar from Armour. Around the time of acquisition, a vial of Acthar cost $40.00.

111.    Aventis lost millions of dollars per year following the acquisition of Acthar, producing only $500,000.00 a year in sales for the drug. Low sales were due to the limited market for Acthar.  Most of Acthar's approved indications could be treated with generic corticosteroids (e.g., prednisone) which limited the market to treatment of IS. However, IS was not an approved indication for Acthar at this time, making its use "off-label."[10] Further limiting the market was the low patient population for patients with IS, which had an annual patient population of around 2,000 children.

112.    In 2001, Questcor acquired Acthar from Aventis for $100,000.00 plus a royalty rate for sales over 10 million.

113.    Immediately after acquisition, Questcor increased the price of Acthar to $748.00. From 2001 until 2014 the end payer price of Acthar grew to $1,980.00.

114.    In 2014, Questcor was purchased by Mallinckrodt for $5.9 billion. At the time of acquisition, Acthar comprised 98% of Questcor's sales.

115.    Sales for Acthar, particularly to Part D beneficiaries, has substantially increased over time. In 2013, the program spent $262.6 million, in 2014 it increased to $391.2 million, and

---

sarcoidosis; and (19) to induce a diuresis or remission of proteinuria in the nephrotic syndrome without uremia of the idiopathic type or that due to lupus erythematosus.

[10] Acthar was approved for use as a monotherapy for infantile spasms by the FDA in 2010.

by 2015 Acthar was one of the top 20 drugs bought for Medicare Part D patients, with over $500 million spent on Acthar for 3,104 patients.

116.    By 2017, Acthar was generating approximately $1.2 billion in sales, accounting for 35% of Mallinckrodt's total revenue.

### Acthar Distribution: Exclusive Distribution through
### Express Scripts and the Price-Fixing and Monopolization Scheme

117.    Mallinckrodt (and previously Questcor) has exercised, and continues, to exercise monopoly power in the U.S. with Acthar. The supra-competitive prices that Mallinckrodt charges for Acthar and its restriction on Acthar's distribution, as outlined below, are evidence of this monopoly power.

118.    Prior to 2007, Acthar was sold through the typical distribution chain as discussed in more detail above. In fact, most of Questcor's products (and thus Acthar) were sold through three distributors which accounted for 91% of their business in 2006.

119.    The chain of distribution was as follows: Questcor would sell Acthar to distributors who in turn sold Acthar to pharmacies. The pharmacies placed orders with the distributors based on their respective levels of sales and inventory practices. Physicians would write prescriptions for Acthar which would be sent to the pharmacies and patients would purchase the drug directly from the pharmacy of their choice.

120.    On July 2, 2007, Questcor issued an Urgent Product Alert advising health care professionals that as of August 1, 2007, Acthar would be available exclusively through the specialty pharmacy distributor, CuraScript (owned by ESI) and coordinated through the "Acthar Hub" which is operated by UBC (owned by ESI at this time). Acthar would no longer be available through traditional pharmaceutical wholesalers or retail pharmacies.

121.    Beginning July 16, 2007, all new Acthar prescriptions had to be submitted through the "Acthar Support & Access Program" ("ASAP").

122.    According to Questcor's Interim President, Don Bailey, "the goal of Questcor's new strategy is to make manufacturing and distribution of Acthar economically viable on a stand-alone basis."[11]

123.    The new distribution system was supposed to provide "seamless support for Acthar" but came with a significant increase in the price of treatment. Questcor believed that the cost for one course of treatment could approach $80,000 to $100,000.[12]

124.    Instead of making the use of Acthar "economically viable," the new distribution system allowed Questcor and Express Scripts to conspire to increase the price of Acthar. Following the new agreement with ESI, the price of Acthar was increased from $1,980 to $27,922.80 per vial.

I.    **Organization of Express Scripts**

125.    Express Scripts offers "integrated specialty services" which includes ESI, CuraScript, and Accredo Health Group Inc. ("Accredo").[13]

126.    Prior to its sale in November 2017, UBC acted as Express Scripts' pharmaceutical support services unit.

127.    ESI is the largest PBM in the U.S. and offers the following services: "network-pharmacy claims processing, home delivery pharmacy care, specialty pharmacy care, benefit-design consultation, drug utilization review, formulary management and medical and drug data

---

[11] Questcor Press Release, *Questcor Board Approves New Strategy and Business Model for H.P. Acthar Gel* (Aug. 27, 2007), www.businesswire.com/news/home/20070827005278/en/Questcor-Board-Approves-New-Strategy-Business-Model (last visited March 15, 2019).

[12] Id.

[13] CuraScript Corporate Overview, https://curascriptsd.com/corporate-overview (last visited March 18, 2019).

analysis services. Express Scripts also distributes a full range of biopharmaceutical products and provides extensive cost-management and patient-care services."[14]

128.    CuraScript is a specialty distributor and Accredo a specialty pharmacy. CuraScript "provides integrated delivery solutions" for the distribution of specialty drugs. CuraScript works with "its ESI sister company, Accredo, by offering healthcare practitioners seamless access to essential therapies and customized business solutions."[15]

129.    UBC provides services to pharmaceutical and biotechnology companies related to late-stage clinical trials, risk management, drug safety and reimbursement and patient assistance.

130.    Beginning in July 2007, Questcor contracted with Express Scripts to use its integrated services to handle distribution for Acthar.

131.    Following the agreement, CuraScript became the exclusive distributor for Acthar.

132.    UBC was contracted to become the coordinator for ASAP. UBC is responsible for receiving and processing Acthar prescriptions, providing patient reimbursement and coverage assistance, patient assistance programs (including handling financial assistance for eligible patients, running the commercial co-pay assistance program), and coordinating shipment of the prescription through CuraScript and Accredo (or another specialty pharmacy).

## II.    Acthar Support & Access Program (ASAP)

133.    A prescription for Acthar can only be obtained through ASAP.

---

[14] Express Scripts Corporate Overview, available for download at lab.express-scripts.com/about/ (last visited March 18, 2019).
[15] CuraScript Specialty Distribution Group Purchasing, https://curascriptsd.com/specialty-distribution-group-purchasing (last visited on March 18, 2019).

134. Once a physician determines that a prescription for Acthar is necessary, the physician must complete an "Acthar Start Form" ("AS Form") (neurology form attached hereto as **Exhibit O**) and fax the form to the "Acthar Hub."

135. The AS Form requires the following information be provided: (1) patient demographics; (2) insurance information; (3) health care provider information; (4) Acthar prescription information (e.g., diagnosis, injection instructions); (5) prescription, consent, and statement of medical necessity; (6) diagnosis information; (7) history of corticosteroid use; (8) concurrent medications; (9) relevant treatment history and other relevant clinical information.

136. The form requires multiple signatures from the prescribing physician. The physician must sign a statement of medical necessity wherein the physician authorizes "United BioSource LLC ("UBC"), the current operator of the Acthar Hub, and other designated operators of the Program to perform a preliminary assessment of benefit verification for this patient…"

137. Each patient must acknowledge that by signing the AS Form, they are authorizing their insurance company, physicians, and pharmacy to "disclose to Mallinckrodt ARD Inc. ("Mallinckrodt"), the distributor and its agents, authorized designees and contractors, including Mallinckrodt reimbursement support personnel and United BioSource LLC ("UBC") or any other operator of the Acthar Hub on behalf of Mallinckrodt" health information relating to their medical condition, treatment and insurance coverage. The authorization allows for "Mallinckrodt and its agents" to provide services to the patient including reimbursement and coverage support, patient assistance and access programs, medication shipment tracking, and home injection training.

138. The "Acthar Hub" is managed by UBC, which assigns each patient a case manager. The case manager calls each patient to discuss insurance coverage, affordability of copayments,

injection training, etc. Once the prescription is approved by the insurance company, the case manager arranges for the drug to be delivered by a specialty pharmacy.

139.    The specialty pharmacy receives the Acthar directly from CuraScript, as the exclusive distributor of Acthar. The specialty pharmacy then sends a starter kit directly to the patient. This distribution process is coordinated by UBC.

140.    Patients who obtained Acthar prescriptions from August 2007 until November 2017 could not receive their prescription without going through at least two ESI subsidiaries. Patients were required to participate in ASAP to obtain their prescriptions which was operated by UBC and their Acthar prescriptions were distributed exclusively through CuraScript who then sent the product to the patients' specialty pharmacy.

141.    Since ESI sold UBC, patients who have received Acthar from November 2017 to present still must go through an ESI subsidiary to obtain their prescriptions, as CuraScript remains the exclusive distributor of the drug.

## Acthar Price Increase

142.    At the time Questcor acquired Acthar in 2001 the cost of a vial was approximately $40.00. Following the acquisition, Questcor raised the end payor price of Acthar to approximately $748.00. From 2001 to 2007, the end payor price grew to $1,980.00.

143.    Following, the deal with Express Scripts to make CuraScript the exclusive distributor and the implementation of ASAP through UBC, the price rose to $27,922.80 – a 1,310% increase in one month, and a 69,707% increase from 2001.

144.    From 2007 to 2010, the price remained stable. However, once Acthar was approved for IS, Questcor increased the price of Acthar 5% on January 3, 2011, another 5% on June 1, 2011 and another increase on December 27, 2011. By 2012, the end payor price was $34,150.00.

145.    In 2014, near in time to Mallinckrodt's purchase of Questcor, the price of Acthar rose to $40,840.80. After acquisition, Mallinckrodt increased the price to $42,942.60 in 2016 and $43,658.40 in 2017.

146.    Since the acquisition of Acthar in 2001, the end payor price has grown 107,400%.



Business Insider, *Jim Chanos' pharma short got crushed after an alley bashed it at Wall Street* (Jun. 6, 2017), www.businessinsider.com/mallinckrodt-stock-price-after-express-scripts-question-acthar-2017-6 (last visited on March 18, 2019).

**Express Scripts Role in the Price-Fixing and Monopolization Scheme**

147.    As the largest PBM in the U.S., Express Scripts is in a position wherein it can negotiate the most competitive, discount prices for specialty drugs. This power allows Express Scripts to challenge attempts by drug manufacturers to charge inflated prices well above the market value.

148.    This bargaining power and ability to provide "cost containment" is one of the reasons a third-party payor hires ESI as its PBM.

149.    In fact, Express Scripts asserts it helps control costs by:

    a. "identifying products and offering solutions that focus on improving patient outcomes and assist in controlling costs";

    b. "evaluating drugs for efficacy, value and price to assist clients in selecting a cost-effective formulary";

    c. "offering cost-effective home delivery pharmacy and specialty services that result in cost savings for plan sponsors and better care for members";

    d. "leveraging purchasing volume to deliver discounts to health benefit providers"; and

    e. "promoting the use of generics and lower-cost brands."[16]

150.    Express Scripts' Chief Medical Officer, Dr. Steve Miller, has discussed the power of Express Scripts to obtain lower prices for its customers in multiple public forums. A selection of his comments regarding Express Scripts' power are below:

> When I joined the company, we represented 12 million members. We're at 85 million today. That gives us extraordinary sway in the marketplace. If you think about any other aspect of health care, no one else has that many lives that they can represent.[17]

> I think because of the continued escalation of cost, you need a PBM now more than ever. And what a best-in-class PBM like Express Scripts does really ensures is great health outcomes and more affordable costs.[18]

> Pharma has shown that they feel very emboldened with their pricing power. We're using our clout in the marketplace to really tamp these down for our clients.[19]

---

[16]    Express Scripts 2017 Annual Report, available for download at https://expressscriptsholdingco.gcs-web.com/financial-information/annual-reports (last viewed on March 18, 2019).

[17]  *Managed Care Magazine Online*, "A Conversation with Steve Miller, MD: Come in and Talk With Us, Pharma," by Peter Wehrwein, April 2015, https://www.managedcaremag.com/archives/2015/4/conversation-steve-miller-md-come-and-talk-us-pharma (last visited March 18, 2019).

[18]  Id.

[19]  *Nightly Business Report*, "Express Scripts Looks to Limit Drug Price Increases" by Meg Tirrell, October 2, 2015, http://nbr.com/2015/10/07express-scripts-looks-to-limit-drug-price-increases/ (last visited March 18, 2019).

As the largest PBM, our job is to make sure our patients, and our clients who provide them a pharmacy benefit, are getting medicines at the lowest net cost while working with our industry partners to make that possible.[20]

151.    Through these statements, Express Scripts has acknowledged its strong influence on the pharmaceutical market and its ability to lower the costs of drugs.

152.    Despite the power to influence and effect the costs of drugs, Express Scripts has done nothing to help lower the cost of Acthar.

153.    After Express Scripts became the exclusive agent for the distribution of Acthar in 2007, the PBM had no incentive to negotiate lower prices on behalf of its customers and their beneficiaries.

154.    The higher the price for Acthar the more money Express Scripts stands to make as the sole distributor. Express Scripts can make as much as 10 to 15 percent on each sale of a specialty drug. Approximately one-third of the company's revenue comes from specialty pharmacy distribution.

155.    By helping Questcor (and now Mallinckrodt) maintain and enhance its monopoly power in the ACTH market, Express Scripts along with the manufacturer, realized greater profits at the expense of third-party payers, like Plaintiffs' Assignors.

156.    When confronted by the 2007 price increase, shortly after Express Scripts became the exclusive distributor, Dr. Steve Miller, stated that "[t]he increase was a manufacturing decision. I can't comment on that."[21]

---

[20] *Real Clear Health*, "Is Drug Pricing at an Inflection Point?" by Steve Miller, April 14, 2017, http://www.realclearhealth.com/articles/2017/04/14/is_drug_pricing_at_an_inflection_point_110 550.html (last visited March 18, 2019).

[21] Milt Freudenheim, *Benefit Managers Profit by Specialty Drug Rights*, New York Times, C1, April 19, 2008, available at www.nytimes.com/2008/04/19/business/19specialty.html (last visited on March 18, 2019).

157. While Express Scripts management has now acknowledged Acthar to be overpriced, the company has done nothing to reduce the price for patients. Instead, the price for Acthar remains outrageously high.

158. Express Scripts failure to use its substantial power to negotiate and reduce the cost of Acthar is in stark contrast to its prior actions regarding the drug Daraprim.

159. In 2015, Turing Pharmaceuticals, LLC ("Turing") acquired the rights to Daraprim and increased the price from $13.50 to $750.00 per pill. A years' worth of treatment rose from $6,500.00 to $361,000.00.

160. On December 1, 2015, ESI announced that it would partner with Imprimis Pharmaceuticals to "drive access to a low-cost alternative to Daraprim."[22] Express Scripts would provide an alternative to Daraprim for the cost of $1.00 per pill.

161. Dr. Steve Miller explained, "[o]ur goal is always to put medicine within reach by making it more affordable and accessible."[23]

162. However, because of the agreement with Questcor (and now Mallinckrodt), Express Scripts has not made it their goal to make Acthar more affordable and accessible. Instead, it was and continues to be, Express Scripts' goal to continue to profit off the increasingly inflated price of Acthar.

**Questcor Engaged in Anticompetitive Behavior by Acquiring Synacthen**

163. Acthar represented 98% of Questcor's revenues prior to its acquisition by Mallinckrodt.

---

[22] Express Scripts Press Release, *Express Scripts Champions $1 per Pill Access to an Alternative for Daraprim*, (Dec. 1, 2015), lab.express-scripts.com/lab/insights/drug-options/express-scripts-champions-1-per-pill-access-to-an-alternative-for-daraprim (last visited March 18, 2019).
[23] Id.

164.    Since the acquisition in 2014, Acthar has become an important revenue source for Mallinckrodt, accounting for 35% of the company's revenue in 2018. The company has stated that "[a]ny disruption in our ability to generate net sales from Acthar could have an adverse impact on our business, financial condition, results of operations and cash flow."[24]

165.    Through the price increases, Acthar sales grew from $1 million in 2001 to over $1 billion in 2017.

166.    Questcor was able to increase the price of Acthar because it was the only ACTH drug on the market. Any competitive product would reduce Questcor's monopoly power and would make it difficult for the company to continue to price-gouge. Thus, the company was on high alert for any potential competitor ACTH drug that could hit the U.S. market.

167.    Questcor discovered a competitive threat to their Acthar monopoly in the U.S. with the development of Synacthen Depot ("Synacthen") by Novartis AG ("Novartis"). Synacthen, a synthetically derived ACTH medication which is injected intra-muscularly, was not yet approved by the FDA for use in the U.S. However, Synacthen was approved in Europe and other countries to treat IS among other disorders.

168.    In 2009, Questcor, recognizing the potential threat to its monopoly if Synacthen was approved in the U.S., attempted to buy the drug. Questcor was unsuccessful.

169.    In 2011, Novartis decided to divest its rights to seek FDA approval for Synacthen in the U.S., along with the marketing rights in over thirty-five other countries where the drug was already approved. Three companies proceeded into negotiations with Novartis, submitting formal

---

[24]    Mallinckrodt   2018   Form   10-K,   available   for   download   at www.mallinckrodt.com/investors/annual-reports (last visited March 19, 2019).

offers and drafting near-final agreements. Each of the three companies planned to develop Synacthen for IS and use it to directly compete with Acthar.

170. In October 2012, Questcor learned that the rights to acquire Synacthen and develop it for the U.S. market were up for sale. Questcor immediately contacted Novartis, signing a confidentiality agreement and submitting an offer for Synacthen.

171. Novartis continued to negotiate with the three bidders and Questcor. By spring of 2013, each of the three prior bidders had submitted a formal offer, each comparable in value and structured similarly with upfront payments, milestone payments upon FDA approval, and significant royalties on U.S. Synacthen sales.

172. One of the three bidders was Retrophin which had agreed to pay Novartis $16 million for the rights to Synacthen.

173. In 2014, Retrophin filed suit against Questcor alleging antitrust violations. Retrophin claimed that it had negotiated and was ready to sign an agreement with Novartis to purchase the U.S. rights to Synacthen. But on June 11, 2013, the day Retrophin was to sign the agreement, Questcor swept in and acquired the rights from under them. Mallinckrodt settled the Retrophin lawsuit for $15.5 million.

174. On June 11, 2013, Questcor and Novartis acquired the exclusive rights to develop, market, and sell Synacthen in the U.S. and over thirty-five countries. Questcor would pay Novartis $60 million in up-front cash with additional payments totaling $75 million over several years (for a total of $135 million).

175. Thus, acquiring the sole competitive threat to Acthar, Questcor was able to retain its monopoly. But for Questcor's acquisition of Synacthen, another bidder would have acquired

the rights to Synacthen to develop the drug for use in the U.S. for the treatment of IS, competing directly with Acthar and at a lower price.

176.    Questcor claimed that it acquired Synacthen with the intent to "develop and seek FDA approval for Synacthen and are committed to developing this product not only in conditions different than Acthar but also in conditions where Synacthen would potentially provide a clinical benefit over Acthar."[25]

177.    Questcor had no intention of seeking FDA approval for use of Synacthen to treat IS. This approval would destroy their Acthar monopoly.

178.    Questcor did submit a request for a Fast Track designation for its Investigational New Drug application for Synacthen in 2016. However, the application was for the treatment of Duchenne muscular dystrophy and not IS or any other indication for which Acthar was already approved.

179.    On January 18, 2017, the FTC announced that Mallinckrodt, as the parent company of Questcor, agreed to pay $100 million to settle FTC charges that Questcor violated antitrust laws when it purchased the rights to Synacthen.

180.    As stated by FTC Chairwoman Edith Ramirez, "Questcor took advantage of its monopoly to repeatedly raise the price of Acthar, from $40 per vial in 2001 to more than $34,000 per vial today – an 85,000 percent increase. We charge that, to maintain its monopoly pricing, it

---

[25] Genetic Engineering & Biotechnology News, *Questcor Acquires Synacthen Rights from Novartis in $135M+ Deal*, https://www.genengnews.com/news/questcor-acquires-synacthen-rights-from-novartis-in-135m-deal/, (last visited March 20, 2019).

acquired the rights to its greatest competitive threat, a synthetic version of Acthar, to forestall future competition. This is precisely the kind of conduct the antitrust laws prohibit."[26]

181.    The settlement required Mallinckrodt to grant a license to develop Synacthen to treat infantile spasms and nephrotic syndrome to a licensee approved by the FTC. The FTC approved the sublicense of Synacthen to Marathon Pharmaceuticals, LLC in July 2017.

182.    From the time it sought FDA approval for the treatment of IS, Mallinckrodt has raised the price of Acthar to over $43,000.00.

183.    Through the exclusive contract for distribution of Acthar with Express Scripts and its purchase of Synacthen, the only potential competitive product, Mallinckrodt has retained 100% of the market for ACTH products. This monopoly power allowed Defendants to increasingly raise the prices of Acthar to the detriment of third-party payers such as Plaintiffs' Assignors.

## CLASS ALLEGATIONS

184.    Plaintiffs bring this action on behalf of themselves and the following class ("Class or "Class Members"):

> All third-party payers, or their assignees, in the United States and its territories, who have, as indirect purchasers, in whole or in part, paid for, provided reimbursement for, and/or possess the recovery rights to reimbursement for the indirect purchase of Acthar from August 1, 2007 to present.

> This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, or municipalities with self-funded prescription drug plans; and (c) any judges or justices involved in this action and any members of their immediate family.

---

[26] FTC Press Release, Mallinckrodt Will Pay $100 Million to Settle FTC, State Charges It Illegally Maintained Its Monopoly of Specialty Drug Used to Treat Infants, (Jan. 18, 2017), https://www.ftc.gov/news-events/press-releases/2017/01/mallinckrodt-will-pay-100-million-settle-ftc-state-charges-it (last visited March 19, 2019).

185. Plaintiffs bring this action pursuant to Rule 23, both individually and on behalf of (a) a national injunctive class and/or (b) a national damages class and/or (c) various state-wide damages sub-classes, during the period from August 1, 2007 to present.

186. As discussed in this Class Action Complaint, Defendants have enjoyed ill-gotten gains from the sales of Acthar at the expense of Class Members, who suffered damages to their property and business. Such damages apply to all Class Members (and Plaintiffs as the rightful assignees of those organizations). Class action law has long recognized that, when a company engages in conduct that has uniformly harmed many claimants such as Plaintiffs, other direct payers, third-party payers, and consumers, class resolution is an effective tool to redress the harm.

187. Here, the Class Members have been deprived of property and money by being forced to purchase prescriptions of Acthar at unlawfully elevated prices as a direct result of Defendants engaging in anti-competitive conduct, as alleged throughout this Complaint.

188. The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy shown as follows:

a. <u>Numerosity</u>: Joinder of all Class Members is impracticable. Upon information and belief, there are many hundreds of third-party payers throughout the United States that were forced to pay artificially inflated, anti-competitive prices for Acthar. Thus, the numerosity element for class certification is met.

b. <u>Commonality</u>: Questions of law and fact are common to all members of the Class. Specifically, Defendants' misconduct was directed at all Class Members, their affiliates, and those respective organizations that provide prescription benefits. Defendants' illegal pattern of anti-competitive conduct had a common, adverse

effect on all purchasers of Acthar. All members of the Class have common questions of fact or law. Each Class Member shares the same needed remedy, i.e., reimbursement for the inflated prices and lost money due to Defendants' monopolistic actions, and imposition of injunctive and equitable relief to stop Defendants from continuing in their anti-competitive activities.

c. <u>Typicality</u>: Plaintiffs' claims are typical of the Class Members' claims, as all have been damaged in the same manner. Plaintiffs' and the Class Members' claims have the same essential characteristics, arise from the same course of conduct, and share the same legal theory. As the putative class representatives, Plaintiffs possess the same interests and suffered the same injury as the other Class Members, which demonstrates a legal sufficient nexus between Plaintiffs' claims and the Class Members' claims. Plaintiffs' claims are typical of the Class Members' claims because Defendants monopolistic and anti-competitive behavior caused Plaintiffs to pay inflated prices for Acthar. Plaintiffs, like the Class Members, have a right to reimbursement for prescriptions of Acthar at anti-competitive prices. Plaintiffs' and Class Members' claims are based on the same statutes, regulations, legal theories and factual situations. Defendants' business practices, acts and omissions are materially the same with respect to Plaintiffs' and the Class Members' claims, as will be Defendants' legal defenses. Plaintiffs' claims are, therefore, typical of the Class.

d. <u>Adequacy</u>: Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs' interests in vindicating these claims are shared with all members of the Class and there are no conflicts between the named Plaintiffs and

the putative Class Members. In addition, Plaintiffs are represented by counsel who are competent and experienced in class action litigation and also have no conflicts.

e. <u>Ascertainability</u>: Locating members of the Class would be relatively simple. For MA Plans, CMS maintains records of all MAOs, i.e., those entities that have contracted directly with CMS pursuant to Medicare Part C and D and providing notice to such entities could be accomplished by direct communication. For third party payers that are not MA Plans, multiple regulatory frameworks will provide for identification and notification. Classes of third-party payers have been certified and successfully administered throughout the state and federal courts many times.

189.    The Class is properly brought and should be maintained as a class action under Rule 23(b) because a class action in this context is superior. Pursuant to Rule 23(b)(3), common issues of law and fact predominate over any questions affecting only individual members of the Class.

190.    Proceeding with a class action is superior to other methods for fair and efficient adjudication of this controversy because, *inter alia*, such treatment will allow a large number of similarly-situated third-party payers to litigate their common claims simultaneously, efficiently, and without the undue duplications of effort, evidence, and expense that individual actions would induce; individual joinder of the individual members is wholly impracticable; the economic damages suffered by the individual class members may be relatively modest compared to the expense and burden of individual litigation; and the court system would benefit from a class action because individual litigation would overload court dockets and magnify the delay and expense to all parties. The class action device presents far fewer management difficulties and provides the comprehensive supervision by a single court with economies of scale.

191.    A class action is superior in that the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class. These adjudications would establish incompatible standards of conduct for the Defendants which would, as a practical matter, be disparities of the claims of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

192.    The Class is properly brought under Rule 23(b)(2) as Defendants have acted or refused to act on grounds that apply generally to the Class, such that final injunctive relief or corresponding declaratory relief is appropriate with respect to the class.

## CAUSES OF ACTION

193.    Plaintiffs and the putative Class allege that Defendants participated in a vertical price fixing scheme and their monopolistic, anti-competitive behavior caused them to suffer harm by paying inflated prices for Acthar prescriptions for their beneficiaries.

194.    The collusion and monopolistic activity between Defendants supplied an atmosphere which drove up the costs of Acthar, resulting in Class damages.

## COUNT I
## SHERMAN ACT VIOLATIONS PURSUANT TO 15 U.S.C. § § 1, 3

195.    Plaintiffs re-allege and and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

196.    Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

197. During the Class Period, Defendants entered into a continuing agreement, understanding and conspiracy in restraint of trade to fix, raise, inflate, stabilize, and/or maintain artificially anti-competitive prices for Acthar in the U.S.

198. Defendants' anti-competitive conduct described above was knowing, willful and constituted violations or flagrant violations of state antitrust statutes as described below.

199. There is no legitimate business jusitification on the part of Defendants for these exclusive and exclusionary agreements, and these agreements: (a) substantially foreclosed and excluded competition from other potential ACTH manufacturers and distributors, and (b) resulted in Defendants' willful maintenance and unlawful exercise of monopoly power in the market for ACTH drugs.

200. At all relevant times, Defendants' exclusive and exclusionary agreements allowed Defendants to (a) effectively exclude less expensive, potentially superior competive products from the ACTH drug market; (b) maintain a dominant market share and monopoly power in the ACTH drug market; (c) maintain prices at artificially elevated levels for Acthar; and (d) otherwise reap the benefits of its illegal monopoly power.

201. Plaintiffs and Class members have been injured and will continue to be injued in their business and property by paying higher prices for Acthar than they would have paid absent Defendants' unlawful conduct.

202. Plaintiffs' injuries are the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

203. Plaintiffs and Class Members are entitled to injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.


## COUNT II
## SHERMAN ACT VIOLATIONS PURSUANT TO 15 U.S.C. § 2

204.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

205.    Defendants monopolized the market for the pharmaceutical Acthar, and thereby, violated the Sherman Act, 15 U.S.C. § 2.

206.    Defendants have, and at all relevant times had, monopoly power in the market for the sale of ACTH drugs in the U.S.

207.    During the Class Period, Defendants bought the rights to bring Acthar's AB rated bioequivalent, Synacthen, to the U.S.

208.    After purchasing these rights, Defendants have not brought Synacthen, to the U.S. market and have not allowed any other entity to bring the pharmaceutical to market.

209.    These acts have caused unreasonable restraints of trade in the market for Acthar.

210.    Defendants' actions had the following effects, among others: (a) price competition in the market for Acthar has been restrained, suppressed, and/or eliminated in the U.S.; (b) prices for Acthar provided by Defendants have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the U.S.; and (c) Plaintiffs and Class Members who purchased Acthar from Defendants have been deprived of the benefits of free and open competition.

211.    As a result of Defendants' unlawful conduct, Plaintiffs and all other similarly situated Class Members that purchased Acthar have been harmed and will continue to be harmed in their business and property by paying inflated, anti-competitive prices that they would not have paid if not for Defendants' unlawful conduct.

212.     Plaintiffs and Class Members are entitled to injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

## COUNT III
## VIOLATION OF STATE ANTITRUST LAWS

213.     Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

214.     During the Class Period, Defendants engaged in a continuing contract, combination or conspiracy with respect to the sale of Acthar, which resulted in unreasonable restraint of trade and commerce and in violation of various state antitrust statutes, as set forth below.

215.     The contract, combination, or conspiracy consisted of an agreement among the Defendants to fix, raise, inflate, stabilize, and/or maintain artificially anti-competitive prices for Acthar in the U.S.

216.     Defendants performed acts in furtherance of the combination and conspiracy, including meetings and participating in conversations among themselves, which took place in the U.S., during which they agreed to fix, increase, inflate, maintain, or stabilize prices that Plaintiffs and the Class Members paid for Acthar.

217.     Defendants engaged in the actions described above for the purpose of carrying out their unlawful monopolization of Acthar.

218.     Defendants' anti-competitive conduct described above was knowing, willful and constituted violations or flagrant violations of state antitrust statutes as described below.

219.     Plaintiffs and other similarly situated payers in the Class in each of the below states have been injured in their business and property due to Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and other similarly situated payers in the Class have paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful

conduct. This injury is of the type the antitrust laws of the below states were designed to prevent and flows from that which makes Defendants' conduct unlawful. In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anti-competitive conduct come at the expense and detriment of Plaintiffs and other similarly situated payers in the Class.

220. Accordingly, Plaintiffs and other similarly situated payers in the Class, in each of the below jurisdictions, seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the below state laws.

## A.    ALABAMA

221. Defendants have entered into an unlawful agreement in restraint of trade in violation of Ala. Code § 6-5-60.

222. Ala Code § 6-5-60 provides that "any person, firm, or corporation injured or damaged by an unlawful trust, combine, or monopoly, or its effect, direct, or indirect, may in each instance of such injury or damage, recover the sum of $500 and all actual damages."

223. Defendants combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Alabama; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Alabama; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Alabama.

224. During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs

and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of Ala. Code § 6-5-60.

225. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

226. Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Ala. Code § 6-5-60.

## B.       ARIZONA

227. Defendants have entered into an unlawful agreement in restraint of trade in violation of Ariz. Rev. Stat. Ann. § 44-1401, *et seq*. ("The Arizona Uniform Antitrust Act").

228. The Arizona Uniform Antitrust Act makes "a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce" illegal. Ariz. Rev. Stat. Ann. § 44-1402. Moreover, "the establishment, maintenance or use of a monopoly or an attempt to establish a monopoly of trade or commerce … for the purpose of excluding competition or controlling, fixing, or maintaining prices is unlawful." Ariz. Rev. Stat. Ann. § 44-1403.

229. Defendants, Plaintiffs, and Class Members are "persons" within the meaning of Ariz. Rev. Stat. Ann. § 44-1401.

230. Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Arizona; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-

competitive, artificially inflated prices for Acthar, including in Arizona.

231.    During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of The Arizona Uniform Antitrust Act.

232.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

233.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Ariz. Rev. Stat. Ann. § 44-1408(b).

## C.    CALIFORNIA

234.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Cal. Bus. & Prof. Code §§ 16700, *et seq.* ("The Cartwright Act").

235.    The Cartwright Act, prohibits a combination of two or more persons "to create or carry out restrictions in trade or commerce … to make or enter into or execute or carry out any contracts, obligations or agreements … by which they do all or any or any combination of the following … agree in any manner to keep the price of such article, commodity, … at a fixed or graduated figure." Cal. Bus. & Prof. Code § 16720.

236.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of Cal. Bus. & Prof. Code § 16702.

237.    Action may be brought by any person injured in his business or property "by reason

of anything forbidden or declared unlawful by this chapter, regardless of whether such injured person dealt directly or indirectly with the defendant." Cal. Bus. & Prof. Code § 16750(a).

238.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout California; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout California; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in California.

239.    During the Class Period, Defendants' illegal conduct substantially affected California commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of The Cartwright Act.

240.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

241.    Plaintiffs' Assignor, UNHC paid $69,769.70 for Acthar prescriptions that were delivered to its beneficiaries through OptumRX, Inc., located in Carlsbad, California.[27]

242.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Cal. Bus. & Prof. Code § 16750(a).

---

[27] Plaintiffs were able to identify Optum Rx using the National Provider Identifier number or "NPI."

D.     **DISTRICT OF COLUMBIA**

243.     Defendants have entered into an unlawful agreement in restraint of trade in violation of D.C. Code Ann. §§ 28-4501, *et seq*.

244.     The District of Columbia declares "every contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce" illegal. D.C. Code § 28-4502. Moreover, it is "unlawful for any person to monopolize, attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of trade or commerce." D.C. Code Ann. § 28-4503.

245.     Defendants, Plaintiffs, and Class Members are "persons" within the meaning of D.C. Code Ann. § 28-4501.

246.     Indirect purchasers are deemed injured pursuant to D.C. Code § 28-4509(a).

247.     Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout the District of Columbia; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including throughout the District of Columbia.

248.     During the Class Period, Defendants' illegal conduct substantially affected the District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of D.C. Code Ann. §§ 28-4501, *et seq*.

249.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

250.     Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under D.C. Code Ann. § 28-4508.

**E.     HAWAII**

251.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Haw. Rev. Stat. §§ 480-1, *et seq.*

252.     Haw. Rev. Stat. § 480-4 declares "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade" illegal. Such acts include efforts to "(1) fix, control, or maintain the price of any commodity; (2) limit, control, or discontinue, the product, manufacture or sale of any commodity for the purpose or with the result of fixing, controlling or maintaining its price." Haw. Rev. Stat. § 480-4(a)-(b). Moreover, in Hawaii "no person shall monopolize, or attempt to monopolize, or combine or conspire with any other persons to monopolize any part of the trade or commerce in any commodity." Haw. Rev. Stat. § 480-9.

253.     Defendants, Plaintiffs, and Class Members are "persons" within the meaning of Haw. Rev. Stat. § 480-1.

254.     Indirect purchasers may bring actions pursuant to Haw. Rev. Stat. § 480-3.

255.     Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Hawaii; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and

open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Hawaii.

256.    During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of Haw. Rev. Stat. §§ 480-1, *et seq.*

257.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

258.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Haw. Rev. Stat. § 480-13.

**F.    ILLINOIS**

259.    Defendants have entered into an unlawful agreement in restraint of trade in violation of 740 Ill. Comp. Stat. 10/ *et seq.* ("Illinois Antitrust Act")

260.    The Illinois Antitrust Act states that any contract with, or combination or conspiracy with, any person "for the purpose or with the effect of fixing, controlling, or maintaining the price or rate for any commodity sold" is a violation of the Act. 740 Ill. Comp. Stat. 10/3.

261.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of 740 Ill. Comp. Stat.  10/4.

262.    Defendants' combinations or conspiracies had the following effects: (1) price

competition for Acthar was restrained, suppressed, and/or eliminated throughout Illinois; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Illinois; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Illinois.

263.    During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of the Illinois Antitrust Act.

264.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

265.    Plaintiffs' Assignors spent approximately $270,262.50 on Acthar prescriptions in Illinois. For example, PHC paid $60,960.40 for Acthar prescriptions that were delivered to its beneficiaries through Caremark, LLC located in Mt. Prospect, Illinois.[28]

266.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under 740 Ill. Comp. Stat. 10/7.

G.    IOWA

267.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* ("Iowa Competition Law").

---

[28] Plaintiffs were able to identify Caremark, LLC using the NPI number.

268.     Iowa Competition Law states that "a contract, combination, or conspiracy between two or more persons shall not restrain or monopolize trade or commerce in a relevant market." Iowa Code 553.4. Moreover, "a person shall not attempt to establish or establish, maintain, or use a monopoly of trade or commerce in a relevant market for the purpose of excluding competition or of controlling, fixing, or maintaining prices." Iowa Code § 553.5.

269.     Defendants, Plaintiffs, and Class Members are "persons" within the meaning of Iowa Code 553.3.

270.     Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Iowa; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Iowa.

271.     During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of Iowa Competition Law.

272.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

273.     Accordingly, Plaintiffs and other similarly situated payers in the Class seek all

54

forms of relief available under Iowa Code § 553.12.

H.   **KANSAS**

274.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Kan. Stat. Ann. §§ 50-101, *et seq.* ("Kansas Restraint of Trade Act").

275.   The Kansas Restraint of Trade Act § 50-101 declares any "combination of capital, skill, or acts, by two or more persons" carried out for the purpose of restricting commerce or trade unlawful. Moreover, "all arrangements, contracts, agreements, trusts, or combinations between persons, designed or which tend to advance, reduce or control the price of the cost to the producer or to the consumer of any such products or articles" are unlawful. Kan. Stat. Ann. § 50-112.

276.   Defendants, Plaintiffs, and Class Members are "persons" within the meaning of Kan. Stat. Ann. § 50-161.

277.   The restraint of trade act "shall not be construed to prohibit: … (2) actions or proceedings by indirect purchasers." Kan. Stat. Ann. § 50-161(b).

278.   Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Kansas; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Kansas.

279.   During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury.  Due to the foregoing, Defendants entered into agreements in

restraint of trade in violation of the Kansas Restraint of Trade Act

280.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

281.     Plaintiffs' Assignor, UNHC paid $205,665.80 for Acthar prescriptions that were delivered to its beneficiaries through OptumRX, Inc. located in Overland Park, Kansas.[29]

282.     Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Kan. Stat. Ann. § 50-161.

## I.     MAINE

283.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10 §§ 1101, *et. seq.*

284.     Me. Rev. Stat. Ann. tit. 10 §§ 1101, declares "every contract, combination in the form of trusts or otherwise, or conspiracy, in restraint of trade or commerce" illegal.

285.     Anyone "injured directly or indirectly" may bring suit under Me. Rev. Stat. tit. 10 § 1104.

286.     Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Maine; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Maine.

---

[29] Plaintiffs were able to identify Optum RX using the NPI number.

287.    During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of Me. Rev. Stat. Ann. tit. 10 §§ 1101, *et. seq.*

288.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

289.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Me. Rev. Stat. Ann. tit. 10 § 1104.

## J.    MARYLAND

290.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Md. Code Ann., Com. Law §§ 11-201, *et seq.* ("Maryland Antitrust Act").

291.    The Maryland Antitrust Act prohibits unreasonable restraint of trade "by contract, combination, or conspiracy." Md. Code Ann., Com. Law § 11-204. Moreover, the Act states that a person may not "monopolize, attempt to monopolize, or combine or conspire with one or more other persons to monopolize any part of the trade or commerce … for the purpose of excluding competition or controlling, fixing, or maintaining prices in trade or commerce." Md. Code Ann., Com. Law § 11-204(a)(1)-(2).

292.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of Md. Code Ann., Com. Law § 11-201.

293.    A person whose business or property is injured or threatened may bring an action

"regardless of whether the person maintaining the action dealt directly or indirectly with the person who has committed the violation." Md. Code Ann., Com. Law § 11-209(b)(2)(i).

294.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Maryland; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maryland; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Maryland.

295.    During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury.  Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of the Maryland Antitrust Act.

296.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

297.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Md. Code Ann., Com. Law § 11-209.

### K.    MICHIGAN

298.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Mich. Comp. Laws Ann. §§ 445.771, *et seq.* ("Michigan Antitrust Reform Act").

299.    The Michigan Antitrust Reform Act declares "a contract, combination, or

conspiracy between 2 or more persons in restraint of, or to monopolize, trade or commerce in a relevant market" unlawful. Mich. Comp. Laws Ann. § 445.772. Moreover, the "establishment, maintenance, or use of a monopoly, or any attempt to establish a monopoly, of trade or commerce in a relevant market by any person, for the purpose of excluding or limiting competition or controlling, fixing, or maintaining prices, is unlawful." Mich. Comp. Laws Ann. § 445.773.

300.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of Mich. Comp. Laws Ann. § 445.771.

301.    Any person "threatened with injury or injured directly or indirectly" may bring action under Mich. Comp. Laws Ann. § 445.778(2).

302.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Michigan; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Michigan.

303.    During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury.  Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of the Michigan Antitrust Reform Act.

304.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants'

unlawful conduct.

305.    Plaintiffs' Assignor, SummaCare paid $59,407.44 for Acthar prescriptions that were delivered to its beneficiaries through Walgreens Specialty Pharmacy, LLC, located in Canton, Michigan.[30]

306.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Mich. Comp. Laws Ann. § 445.778.

## L.    MINNESOTA

307.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. Ann. §§ 325D.49, *et seq.* ("Minnesota Antitrust Law of 1971").

308.    The Minnesota Antitrust Law of 1971 declares "a contract, combination, or conspiracy between two or more persons in unreasonable restraint of trade or commerce" unlawful. Minn. Stat. Ann. § 325D.51. Moreover, the "establishment, maintenance, or use of, or any attempt to establish, maintain, or use monopoly power over any part of trade or commerce by any person or persons for the purpose of affecting competition or controlling, fixing, or maintaining prices is unlawful." Minn. Stat. Ann. § 325D.52. Any contract, combination, or conspiracy with the purpose of effect of "affecting, fixing, controlling or maintaining the market price, or fee of any commodity or service" or "affecting, fixing, controlling, maintaining, limiting, or discontinuing the production, manufacture, mining, sale or supply of any commodity … for the purpose or with the effect of affecting, fixing, controlling, or maintaining the market price, rate, or fee of the commodity or service" is unlawful. Minn. Stat. Ann. § 325D.53.

309.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of Minn. Stat. Ann. § 325D.50.

---

[30] Plaintiffs were able to identify Walgreens Specialty Pharmacy LLC using the NPI number.

310.    The Minnesota Antitrust Law of 1971 allows any person "injured directly or indirectly" to bring an action. Minn. Stat. Ann. § 325D.57.

311.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Minnesota; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Minnesota.

312.    During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of the Minnesota Antitrust Law of 1971.

313.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

314.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Minn. Stat. Ann. § 325D.57.

## M.    MISSISSIPPI

315.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Miss. Code Ann. §§ 75-21-1, *et seq.*

316.    Miss. Code Ann. § 75-21-1 declares trusts unlawful, which includes "any

combination, contract, understanding, or agreement, express or implied" that would be inimical to public welfare and the effect of which would be restraint of trade and/or any "increase … on the price of a commodity." Moreover, any monopolization or "attempt to monopolize the production, control or sale of any commodity, or the prosecution, management or control of any kind, class or description of business" is not allowed. Miss. Code Ann. §§ 75-21-3.

317. Any person "natural or artificial, injured or damaged by a trust or combine … or by its effects direct or indirect" may bring suit. Miss. Code Ann. §§ 75-21-9.

318. Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Mississippi; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Mississippi.

319. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of Miss. Code Ann. §§ 75-21-1, *et seq.*

320. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

321. Accordingly, Plaintiffs and other similarly situated payers in the Class seek all

forms of relief available under MS Code § 75-21-9.

### N.    NEBRASKA

322.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Neb. Rev. Stat. §§ 59-801, *et seq.* ("Junkin Act").

323.    The Junkin Act declares "every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce" illegal.  Neb. Rev. Stat. § 59-801.

324.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of Neb. Rev. Stat. § 59-822.

325.    Any person injured, "whether such injured person dealt directly or indirectly with the defendant" may bring suit. Neb. Rev. Stat. § 59-821.

326.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Nebraska; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Nebraska.

327.    During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of the Junkin Act.

328.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that

they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

329.   Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Neb. Rev. Stat. § 59-821.

**O.    NEVADA**

330.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.* ("Nevada Unfair Trade Practices Act").

331.   The Nevada Unfair Trade Practices Act prohibits "price fixing, which consists of raising, depressing, fixing, pegging or stabilizing the price of any commodity or service." Nev. Rev. Stat. Ann. § 598A.060.

332.   Any person injured "directly or indirectly" may bring suit. Nev. Rev. Stat. Ann. § 598A.210(2).

333.   Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Nevada; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Nevada.

334.   During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of the Nevada Unfair Trade Practices Act

335.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

336.     Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Nev. Rev. Stat. Ann. § 598A.210.

P.     **NEW HAMPSHIRE**

337.     Defendants have entered into an unlawful agreement in restraint of trade in violation of N.H. Rev. Stat. Ann §§ 356:1, *et seq.*

338.     N.H. Rev. Stat. Ann § 356:2 declares "every contract, combination, or conspiracy … which has the purpose or the effect of: (a) fixing, controlling, maintaining prices, rates, quotations or fees in any part of trade or commerce" unlawful. N.H. Rev. Stat. Ann § 356:2. Moreover, "the establishment, maintenance or use of monopoly power, or any attempt to establish, maintain or use monopoly power over trade or commerce for the purpose of affecting competition or controlling, fixing or maintaining prices is unlawful." N.H. Rev. Stat. Ann § 356:3.

339.     Defendants, Plaintiffs, and Class Members are "persons" within the meaning of N.H. Rev. Stat. Ann § 356:1.

340.     Any person injured "whether that person dealt directly or indirectly with the defendant" may bring suit. N.H. Rev. Stat. Ann § 356:11.

341.     Defendants combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout New Hampshire; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and other similarly situated payers in the Class were deprived of

65

free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in New Hampshire.

342. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of N.H. Rev. Stat. Ann § 356:1, *et seq.*

343. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

344. Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under N.H. Rev. Stat. Ann § 356:11.

## Q.    NEW MEXICO

345. Defendants have entered into an unlawful agreement in restraint of trade in violation of N.M. Stat. Ann. §§ 57-1-1, *et. seq.* ("New Mexico Antitrust Act").

346. The New Mexico Antitrust Act declares "every contract, agreement, combination or conspiracy of trade or commerce" illegal. N.M. Stat. Ann. § 57-1-1. Moreover, it is unlawful "for any person to monopolize or attempt to monopolize or combine or conspire with any other person or persons to monopolize, trade or commerce." N.M. Stat. Ann. § 57-1-2.

347. Defendants, Plaintiffs, and Class Members are "persons" within the meaning of N.M. Stat. Ann. § 57-1-1.2.

348. Any person injured "directly or indirectly" may bring suit under N.M. Stat. Ann. §

57-1-1.3.

349.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout New Mexico; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in New Mexico.

350.    During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of the New Mexico Antitrust Act.

351.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

352.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under N.M. Stat. Ann. § 57-1-3.

### R.    NEW YORK

353.    Defendants have entered into an unlawful agreement in restraint of trade in violation of N.Y. Gen. Bus. Law §§ 340, *et seq.* ("Donnelly Act").

354.    The Donnelly Act declares "every contract, agreement, arrangement or combination" where a "monopoly … may be established" or where "competition or the free

exercise of any activity … may be restrained" illegal. N.Y. Gen. Bus. Law § 340(1).

355. The fact that "any person who sustained damages by reason of violation of this section has not dealt directly with the defendant shall not bar or otherwise limit recovery." N.Y. Gen. Bus. Law § 340(6).

356. Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout New York; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in New York.

357. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of the Donnelly Act.

358. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

359. Plaintiffs' Assignor, Emblem, paid $9,814,270.02 for Acthar prescriptions that were delivered to its beneficiaries throughout New York, including through Procare Pharmacy,

LLC, located in New York, NY.[31]

360.   Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under N.Y. Gen. Bus. Law § 340(5).

**S.    NORTH CAROLINA**

361.   Defendants have entered into an unlawful agreement in restraint of trade in violation of N.C. Gen. Stat. Ann. §§ 75-1, *et seq.*

362.   N.C. Gen. Stat. Ann. § 75-1 declares "every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce" illegal. Moreover, it is "unlawful for any person to monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize, any part of trade or commerce." N.C. Gen. Stat. Ann. § 75-2.1.

363.   Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout North Carolina; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in North Carolina.

364.   During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements

---

[31] Plaintiffs were able to identify the prescribing physicians  for Acthar prescriptions and Procare Pharmacy, LLC using the NPI numbers.

in restraint of trade in violation of N.C. Gen. Stat. Ann. §§ 75-1, *et seq.*

365.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

366.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under N.C. Gen. Stat. Ann. § 75-15.2.

**T.    NORTH DAKOTA**

367.    Defendants have entered into an unlawful agreement in restraint of trade in violation of N.D. Cent. Code. Ann. §§ 51-08.1-01, *et seq.*  ("Uniform State Antitrust Act").

368.    The Uniform State Antitrust Act declares a "contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in a relevant market" unlawful. N.D. Cent. Code. Ann. § 51-08.1-02. Moreover, the "establishment, maintenance, or use of a monopoly, or an attempt to establish a monopoly, of trade or commerce in a relevant market by any person, for the purpose of excluding competition or controlling, fixing, or maintaining prices, is unlawful." N.D. Cent. Code. Ann. § 51-08.1-03.

369.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of N.D. Cent. Code. Ann. § 51-08.1-01.

370.    The fact that a person injured or threatened with injury "has not dealt directly with the defendant does not bar recovery." N.D. Cent. Code. Ann. § 51-08.1-08(3).

371.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout North Dakota; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout

North Dakota; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in North Dakota.

372. During the Class Period, Defendants' illegal conduct substantially affected North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of the Uniform State Antitrust Act.

373. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

374. Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under N.D. Cent. Code. Ann. § 51-08.1-08(2).

**U.    OREGON**

375. Defendants have entered into an unlawful agreement in restraint of trade in violation of Ore. Rev. Stat. §§ 646.705, *et seq.*

376. Ore. Rev. Stat. § 646.725 declares "every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce" illegal. Moreover, it is unlawful for any person to "monopolize, or attempt to monopolize, co combine or conspire with any other person or persons, to monopolize any part of trade or commerce." Ore. Rev. Stat. § 646.730.

377. An action may be brought "regardless of whether the plaintiff dealt directly or indirectly with the adverse party." Ore. Rev. Stat. § 646.780(1)(a).

378.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Oregon; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Oregon.

379.    During the Class Period, Defendants' illegal conduct substantially affected Oregon commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of Ore. Rev. Stat. § 646.705, *et seq.*

380.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

381.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Ore. Rev. Stat. § 646.780.

### V.    PUERTO RICO

382.    Defendants have entered into an unlawful agreement in restraint of trade in violation of P.R. Laws Ann. tit 10 §§ 257, *et seq*.

383.    P.R. Laws Ann. tit 10 § 258, declares "every contract, combination in the form of trust or otherwise, or conspiracy in unreasonable restraint of trade or commerce" illegal.

384.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of

P.R. Laws Ann. tit 10 § 257.

385.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Puerto Rico; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Puerto Rico; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Puerto Rico.

386.    During the Class Period, Defendants' illegal conduct substantially affected Puerto Rico commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of P.R. Laws Ann. tit 10 §§ 257, *et seq*.

387.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

388.    Plaintiffs' Assignor, APCM paid $343,280.10 for Acthar prescriptions that were delivered to its beneficiaries throughout Puerto Rico.

389.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under P.R. Laws Ann. tit 10 § 268(a).

## W.    RHODE ISLAND

390.    Defendants have entered into an unlawful agreement in restraint of trade in violation of R.I. Gen. Laws §§ 6-36-1, *et seq.* ("Rhode Island Antitrust Act").

391.     The Rhode Island Antitrust Act declares "every contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce" unlawful. R.I. Gen. Laws § 6-36-4. Moreover, "the establishment, maintenance, or use of a monopoly, or an attempt to establish a monopoly, of trade or commerce by any person, for the purpose of excluding competition or controlling, fixing, or maintaining prices, is unlawful." R.I. Gen. Laws § 6-36-5.

392.     Defendants, Plaintiffs, and Class Members are "persons" within the meaning of R.I. Gen. Laws § 6-36-3.

393.     The fact that a person "has not dealt directly with the defendant shall not bar or otherwise limit recovery." R.I. Gen. Laws § 6-36-7(d).

394.     Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Rhode Island; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Rhode Island.

395.     During the Class Period, Defendants' illegal conduct substantially affected Rhode Island commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of S.D. Codified Laws R.I. Gen. Laws §§ 6-36-1, *et seq.*

396.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants'

unlawful conduct.

397.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under R.I. Gen. Laws § 6-36-11.

## X.    SOUTH DAKOTA

398.    Defendants have entered into an unlawful agreement in restraint of trade in violation of S.D. Codified Laws §§ 37-1-1, *et seq.*

399.    S.D. Codified Laws § 37-1-3.1 declares "a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce" unlawful. Moreover, "the monopolization by any person, or an attempt to monopolize, or combine, or conspire with any other person or persons, to monopolize any of the trade or commerce" is unlawful. S.D. Codified Laws § 37-1-3.2.

400.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of S.D. Codified Laws § 37-1-3.1.

401.    No person "who is injured directly or indirectly" may be denied the right to bring this action. S.D. Codified Laws § 37-1-33.

402.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout South Dakota; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in South Dakota.

403.    During the Class Period, Defendants' illegal conduct substantially affected South Dakota commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs

and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of S.D. Codified Laws §§ 37-1-1, *et seq.*

404. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

405. Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under S.D. Codified Laws §§ 37-1-14.3, 37-1-24.

## Y.   TENNESSEE

406. Defendants have entered into an unlawful agreement in restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, *et seq.*

407. Tenn. Code Ann. § 47-25-101 declares "all arrangements, contracts, agreements, trusts, or combinations between persons or corporations … which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article" against public policy, unlawful, and void.

408. Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Tennessee; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Tennessee.

409. During the Class Period, Defendants' illegal conduct substantially affected

Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, *et seq.*

410. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

411. Plaintiffs' Assignors have spent approximately $3,191,986.22 on Acthar prescriptions in Tennessee. For example, Emblem paid $1,312,815.89 for Acthar prescriptions that were delivered to its beneficiaries through Accredo Health Group, Inc. located in Memphis, Tennessee.[32]

412. Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Tenn. Code Ann. § 47-25-106.

**Z.    UTAH**

413. Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Ann. §§ 76-10-3101, *et seq.* ("Utah Antitrust Act").

414. The Utah Antitrust Act declares "every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce" illegal. Utah Code Ann. § 76-10-3104. Moreover, it is unlawful "for any person to monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of trade or commerce." Utah Code Ann. § 76-10-3104.

---

[32] Plaintiffs were able to identify Accredo Health Group, Inc. using the NPI number.

415.    Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Utah; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Utah.

416.    During the Class Period, Defendants' illegal conduct substantially affected Utah commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of the Utah Antitrust Act.

417.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

418.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Utah Code Ann. § 76-10-3109.

## AA.    VERMONT

419.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Vt. Stat. Ann. tit. 9 §§ 2453, *et seq.*

420.    Vt. Stat. Ann. tit. 9 § 2453 makes "unfair methods of competition in commerce" unlawful.

421.    The fact that a person "has not dealt directly with a defendant shall not bar or

otherwise limit recovery." Vt. Stat. Ann tit. 9 § 2465.

422.     Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Vermont; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Vermont.

423.     During the Class Period, Defendants' illegal conduct substantially affected Vermont commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of Vt. Stat. Ann. tit. 9 §§ 2453, *et seq.*

424.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

425.     Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Vt. Stat. Ann. tit. 9 § 2465.

## BB.    WEST VIRGINIA

426.     Defendants have entered into an unlawful agreement in restraint of trade in violation of W. Va. Code Ann. §§ 47-18-1, *et seq*. ("West Virginia Antitrust Act").

427.     The West Virginia Antitrust Act declares "every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce" unlawful. W. Va. Code Ann

§ 47-18-3(a). A contract, combination or conspiracy "for the purpose or with the effect of fixing, controlling, or maintaining the market price, rate or fee of any commodity or service" is unlawful. W. Va. Code Ann. § 47-18-3(b)(1). Moreover, the establishment, maintenance or use of a monopoly or an attempt to establish a monopoly of trade or commerce … by any persons for the purpose of excluding competition or controlling, fixing or maintaining prices is unlawful." W. Va. Code Ann. § 47-18-4.

428. Defendants, Plaintiffs, and Class Members are "persons" within the meaning of W. Va. Code Ann. § 47-18-2.

429. Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout West Virginia; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in West Virginia.

430. During the Class Period, Defendants' illegal conduct substantially affected West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of the West Virginia Antitrust Act.

431. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

432.     Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under W. Va. Code Ann. § 47-18-2.

**CC.     WISCONSIN**

433.     Defendants have entered into an unlawful agreement in restraint of trade in violation of Wis. Stat. Ann. §§ 133.01, *et seq.*

434.     Wis. Stat. Ann. § 133.03 declares "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce" illegal.

435.     Defendants, Plaintiffs, and Class Members are "persons" within the meaning of Wis. Stat. Ann. § 133.02.

436.     Any person who is injured "directly or indirectly" may bring suit. Wis. Stat. Ann. § 133.18.

437.     Defendants' combinations or conspiracies had the following effects: (1) price competition for Acthar was restrained, suppressed, and/or eliminated throughout Wisconsin; (2) Acthar prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and other similarly situated payers in the Class were deprived of free and open competition; and (4) Plaintiffs and other similarly situated payers in the Class paid anti-competitive, artificially inflated prices for Acthar, including in Wisconsin.

438.     During the Class Period, Defendants' illegal conduct substantially affected Wisconsin commerce.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and other similarly situated payers in the Class have been injured in their business and property and are threatened with further injury. Due to the foregoing, Defendants entered into agreements in restraint of trade in violation of Wis. Stat. Ann. §§ 133.01, *et seq.*

439.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and

other similarly situated payers in the Class have been injured in their business and property in that they paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct.

440.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Wis. Stat. Ann. § 133.18.

## COUNT IV
## VIOLATION OF STATE CONSUMER PROTECTION STATUTES

441.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

442.    During the Class Period, Defendants engaged in continuing unfair, false, unconscionable, or deceptive acts or practices with respect to the sale of Acthar, in violation of various state consumer protection statutes, as set forth below.

443.    The unfair, false, unconscionable, or deceptive acts or practices consisted of an agreement among the Defendants to fix, raise, inflate, stabilize, and/or maintain artificially anti-competitive prices for Acthar in the U.S. Moreover, Defendants concealed their agreements from Plaintiffs, Class Members, and the public.

444.    Defendants' anti-competitive conduct described above was knowing, willful and constituted flagrant violations of several state consumer protection statutes as described below.

445.    Plaintiffs and other similarly situated payers in the Class in each of the below states have been injured in their business and property due to Defendants' unfair, false, unconscionable, or deceptive acts or practices. Plaintiffs and other similarly situated payers in the Class have paid more for Acthar than they otherwise would have paid in the absence of Defendants' unlawful conduct. In addition, Defendants have profited significantly from the aforesaid unlawful behavior. Defendants' profits derived from their anti-competitive conduct come at the expense and detriment

of members of Plaintiffs and other similarly situated payers in the Class.

446.   Accordingly, Plaintiffs and other similarly situated payers in the Class, in each of the below jurisdictions, seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a jurisdiction's consumer protection law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## A.    ALASKA

447.   Defendants have willingly and knowingly engaged in unfair methods of competition, and unfair and deceptive acts or practices in violation of Alaska Stat. §§ 45.50.471, *et seq*. ("Alaska Unfair Trade Practices and Consumer Protection Act).

448.   The Alaska Unfair Trade Practices and Consumer Protection Act declares "unfair methods of competition and unfair or deceptive acts or practices" unlawful. Alaska Stat. § 45.50.471

449.   Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in Alaska and took efforts to conceal their agreements from Plaintiffs and members of the Class.

450.   Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

451.   Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through

which Plaintiffs could avoid the overcharges.

452. Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

453. Defendants' took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

454. Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout Alaska; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout Alaska; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in Alaska.

455. During, the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and consumers.

456. Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Alaska Stat. §§ 45.50.531, and 45.50.537.

**B**.    **ARKANSAS**

457. Defendants have willingly and knowingly engaged in unconscionable, false, or deceptive acts or practices in violation of Ark. Code Ann. §§ 4-88-101, *et seq.* ("The Arkansas Deceptive Trade Practices Act").

458. The Arkansas Deceptive Trade Practices Act forbids "engaging in any … unconscionable, false, or deceptive act or practice in business, commerce, or trade." Ark. Code Ann. § 4-88-107(10).

459. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Class.

460. Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

461. Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

462. Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

463. Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

464.    Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout Arkansas; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in Arkansas.

465.    During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

466.    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

467.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Ark. Code Ann. § 4-88-113.

### C.    CONNECTICUT

468.    Defendants have willingly and knowingly engaged in in unfair methods of competition, or unfair acts or practices, or deceptive acts or practices in violation of Conn. Gen. Stat. §§ 42-110a, *et seq.* ("Connecticut Unfair Trade Practices Act").

469.    The Connecticut Unfair Trade Practices Act prohibits engagement in "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. §§ 42-110b.

470.    As alleged herein, Defendants have willingly and knowingly engaged in unfair methods of competition, unconscionable acts or practices, or deceptive acts or practices in violation of the Connecticut Unfair Trade Practices Act.

471.    Defendants, Plaintiffs, and Class Members are "persons" as defined by Conn. Gen. Stat. § 42-110a.

472.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in Connecticut and took efforts to conceal their agreements from Plaintiffs and members of the Class.

473.    Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

474.    Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

475.    Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

476.    Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

477.    Defendants' unlawful conduct had the following effects: (1) Acthar price

competition was restrained, suppressed, and eliminated throughout Connecticut; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout Connecticut; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in Connecticut.

478.  During, the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce and consumers.

479.  As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

480.  Plaintiffs' Assignor, ConnectiCare, a Connecticut corporation, has spent approximately $9,218,702.18 on Acthar prescriptions that were delivered to its beneficiaries throughout Connecticut.[33]

481.  Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Conn. Gen. Stat. § 42-110g.

**D.  DELAWARE**

482.  Defendants have willingly and knowingly engaged in deceptive acts or practices in violation of Del. Code Ann. tit 6, §§ 2511, *et seq.*

483.  Del. Code Ann. tit 6, § 2513 declares "the act, use or employment of any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with the intent that others rely upon such

---

[33] Plaintiffs were able to identify the prescribing physicians for Acthar prescriptions using the NPI number.

concealment, suppression or omission, in connection with the sale … or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged" unlawful.

484.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of Del. Code Ann. tit 6, § 2511.

485.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in Delaware and took efforts to conceal their agreements from Plaintiffs and members of the Class.

486.    Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

487.    Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

488.    Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

489.    Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price

paid and the value received for Acthar.

490.    Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout Delaware; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout Delaware; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in Delaware.

491.    During the Class Period, Defendants' illegal conduct substantially affected Delaware commerce and consumers.

492.    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

493.    Plaintiffs' Assignor, ConnectiCare paid $3,968,008.52 for Acthar prescriptions that were delivered to its beneficiaries through Accredo Health Group, Inc. located in New Castle, Delaware.[34]

494.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Del. Code Ann. tit 6, § 2525.

E.    **FLORIDA**

495.    Defendants have willingly and knowingly engaged in unfair methods of competition, unconscionable, or deceptive acts or practices in violation of Fla. Stat. §§ 501.201, *et seq.* ("The Florida Deceptive and Unfair Trade Practices Act").

496.    The Florida Deceptive and Unfair Trade Practices Act is designed to "protect the

---

[34] Plaintiffs were able to identify Accredo Health Group Inc. using the NPI number.

consuming public from those that engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202. The Act declares "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" to be unlawful. Fla. Stat. § 501.204.

497.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in Florida and took efforts to conceal their agreements from Plaintiffs and members of the Class.

498.     Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

499.     Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

500.     Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

501.     Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in

unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

502.    Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout Florida; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout Florida; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in Florida.

503.    During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

504.    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

505.    Many of Plaintiffs' Assignors are Florida entities and limited liability companies. Plaintiffs' Assignors have spent approximately $2,683,773.00 on Acthar prescriptions in Florida. For example, PMPI, a Florida entity, paid $96,975.00 for Acthar prescriptions that were delivered to its beneficiaries throughout Florida.[35]

506.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Fla. Stat. § 501.207.

---

[35] Plaintiffs were able to identify the prescribing physicians for Acthar prescriptions using the NPI number.

F.     GEORGIA

507.    Defendants have willingly and knowingly engaged in deceptive acts or practices in violation of Ga. Code Ann. §§ 10-1-370, *et seq.* ("Uniform Deceptive Trade Practices Act").

508.    Georgia's Uniform Deceptive Trade Practices Act forbids persons to engage in deceptive trade practice, including but not limited to, "engaging in any other conduct which … creates a likelihood of confusion or misunderstanding." Ga. Code Ann. § 10-1-373.

509.    Defendants, Plaintiffs, and Class Members are "persons" as defined by Ga. Code Ann. § 10-1-371.

510.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in Georgia and took efforts to conceal their agreements from Plaintiffs and members of the Class.

511.    Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

512.    Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

513.    Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the

expense of Plaintiffs and the public.

514. Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

515. Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout Georgia; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout Georgia; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in Georgia.

516. During, the Class Period, Defendants' illegal conduct substantially affected Georgia commerce and consumers.

517. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

518. Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Ga. Code Ann. § 10-1-373.

G.    ILLINOIS

519. Defendants have willingly or knowingly engaged in unfair methods of competition, or unfair acts or practices, or deceptive acts or practices in violation of 815 Ill. Comp. Stat. Ann. 501/1, *et seq*. ("Consumer Fraud and Deceptive Business Practices Act").

520. The Consumer Fraud and Deceptive Business Practices Act declares "unfair

methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or concealment, suppression or omission of any material fact" unlawful. 815 Ill. Comp. Stat. Ann. 501/2.

521. Defendants, Plaintiffs, and Class members are within the meaning of "persons" as defined by 815 Ill. Comp. Stat. Ann. 501/1.

522. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in Illinois and took efforts to conceal their agreements from Plaintiffs and members of the Class.

523. Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

524. Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

525. Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

526. Defendants took grossly unfair advantage of Plaintiffs. The suppression of

competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

527.    Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout Illinois; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in Illinois.

528.    During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce and consumers.

529.    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

530.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under 815 Ill. Comp. Stat. Ann. 501/10.

## H.    IDAHO

531.    Defendants have engaged in in unfair methods of competition, or unfair acts or practices, or deceptive acts or practices in violation of Idaho Code Ann. §§ 48-601, *et seq.* ("Idaho Consumer Protection Act").

532.    The Idaho Consumer Protection Act declares unlawful "unfair methods of competition and unfair or deceptive acts or practices" including "engaging in any unconscionable method, act or practice in the conduct of trade or commerce." Idaho Code Ann. §§ 48-603 and 48-

603c.

533.     Defendants, Plaintiffs, and Class Members are "persons" as defined by Idaho Code Ann. § 48-602.

534.     As alleged herein, Defendants have willingly and knowingly engaged in unfair methods of competition, unconscionable acts or practices, or deceptive acts or practices in violation of the Idaho Consumer Protection Act.

535.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in Idaho and took efforts to conceal their agreements from Plaintiffs and members of the Class.

536.     Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

537.     Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

538.     Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

539.     Defendants took grossly unfair advantage of Plaintiffs. The suppression of

competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

540. Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout Idaho; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout Idaho; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in Idaho.

541. During, the Class Period, Defendants' illegal conduct substantially affected Idaho commerce and consumers.

542. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

543. Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Idaho Code Ann. § 48-608.

**I.      MAINE**

544. Defendants have engaged in unfair methods of competition, or unfair acts or practices, or deceptive acts or practices in violation of Me. Rev. Stat. Ann. tit. 10 §§ 1211, *et seq.* ("Uniform Deceptive Trade Act").

545. The Uniform Deceptive Trade Act forbids any deceptive trade practices including but not limited to "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Me. Rev. Stat. Ann. tit. 10 § 1212.

546. Defendants, Plaintiffs, and Class Members are within the meaning of "person" as defined in Me. Rev. Stat. Ann. tit. 10 § 1211.

547. As alleged herein, Defendants have willingly and knowingly engaged in unfair methods of competition, unconscionable acts or practices, or deceptive acts or practices in violation of the Uniform Deceptive Trade Act

548. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in Maine and took efforts to conceal their agreements from Plaintiffs and members of the Class.

549. Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

550. Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

551. Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

552. Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in

unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

553.    Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout Maine; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout Maine; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in Maine.

554.    During the Class Period, Defendants' illegal conduct substantially affected Maine commerce and consumers.

555.    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

556.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Me. Rev. Stat. Ann. tit. 10 § 1213.

**J.    MASSACHUSETTS**

557.    Defendants have engaged in unfair methods of competition, or unfair acts or practices, or deceptive acts or practices in violation of Mass. Gen. Laws ch. 93A, § 1, *et seq.*

558.    Mass. Gen. Laws ch. 93A, § 2 declares "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" unlawful. Mass. Gen. Laws ch. 93A, § 2(a).

559.    As alleged herein, Defendants have willingly and knowingly engaged in unfair methods of competition, unconscionable acts or practices, or deceptive acts or practices in

100

violation of Mass. Gen. Laws ch. 93A, § 1, *et seq.*

560.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiffs and members of the Class.

561.    Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

562.    Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

563.    Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

564.    Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

565.    Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) Acthar

prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout Massachusetts; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in Massachusetts.

566.    During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce and consumers.

567.    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

568.    Plaintiffs' Assignor, ConnectiCare, paid $209,495.54 for Acthar prescriptions that were delivered to its beneficiaries through Procare Pharmacy, LLC located in Boston, Massachusetts.[36]

569.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Mass. Gen. Laws ch. 93A, § 11.

**K.    MINNESOTA**

570.    Defendants have engaged in fraud, misrepresentations, or deceptive acts or practices in violation of Minn. Stat. Ann. §§ 325F.68, *et seq.*

571.    Minn. Stat. Ann. § 325F.68 declares "the act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in … whether or not any person has in fact been misled, deceived, or damaged thereby."

572.    Defendants, Plaintiffs, and Class Members are within the meaning of "person" as

---

[36] Plaintiffs were able to identify Procare Pharmacy, LLC using the NPI number.

defined under Minn. Stat. Ann. § 325F.68.

573.    As alleged herein, Defendants have willingly and knowingly engaged in unfair methods of competition, unconscionable acts or practices, or deceptive acts or practices in violation of Minn. Stat. Ann. §§ 325F.68, *et seq.*

574.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in Minnesota and took efforts to conceal their agreements from Plaintiffs and members of the Class.

575.    Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

576.    Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

577.    Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

578.    Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price

paid and the value received for Acthar.

579. Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout Minnesota; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in Minnesota.

580. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and consumers.

581. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

582. Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Minn. Stat. Ann. § 325F.70.

## L. NEBRASKA

583. Defendants have engaged in unfair methods of competition, or unfair acts or practices, or deceptive acts or practices in violation of Neb. Rev. Stat. §§ 59-1601, *et seq.* ("Consumer Protection Act").

584. Nebraska's Consumer Protection Act declares "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" unlawful. Neb. Rev. Stat. § 59-1602.

585. As alleged herein, Defendants have willingly and knowingly engaged in unfair methods of competition, unconscionable acts or practices, or deceptive acts or practices in

violation of Nebraska's Consumer Protection Act.

586.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in Nebraska and took efforts to conceal their agreements from Plaintiffs and members of the Class.

587.    Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

588.    Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

589.    Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

590.    Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

591.    Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Acthar prices

were raised, fixed, maintained, and stabilized at artificially elevated levels throughout Nebraska; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in Nebraska.

592. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce and consumers.

593. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

594. Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Neb. Rev. Stat. § 59-1609.

**M.  NEVADA**

595. Defendants have engaged in unfair methods of competition, or unfair acts or practices, or deceptive acts or practices in violation of Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*

596. Nev. Rev. Stat. Ann. § 598A.0915 forbids deceptive trade practices, including but not limited to, knowingly making "false representation in a transaction."

597. As alleged herein, Defendants have willingly and knowingly engaged in unfair methods of competition, unconscionable acts or practices, or deceptive acts or practices in violation of Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*

598. Plaintiffs and Class Members can bring this suit pursuant to Nev. Rev. Stat. Ann. § 41.600, which permits "any person who is a victim of consumer fraud" to file suit.

599. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels,

the prices at which Acthar was sold, distributed or obtained in Nevada and took efforts to conceal their agreements from Plaintiffs and members of the Class.

600. Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

601. Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

602. Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

603. Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

604. Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout Nevada; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar,

including in Nevada.

605.     During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce and consumers.

606.     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

607.     Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Nev. Rev. Stat. Ann. §§ 41.600 and 598.0993.

### N.     NEW HAMPSHIRE

608.     Defendants have engaged in unfair methods of competition, or unfair acts or practices, or deceptive acts or practices in violation of N.H. Rev. Stat. Ann §§ 358-A:1, *et seq.*

609.     N.H. Rev. Stat. Ann § 358-A:2 declares "any unfair method of competition or any unfair or deceptive act or practice" unlawful.

610.     Defendants, Plaintiffs, and Class Members are "persons" within the meaning of N.H. Rev. Stat. Ann §§ 358-A:1.

611.     As alleged herein, Defendants have willingly and knowingly engaged in unfair methods of competition, unconscionable acts or practices, or deceptive acts or practices in violation of N.H. Rev. Stat. Ann §§ 358-A:1, *et seq*.

612.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in New Hampshire and took efforts to conceal their agreements from Plaintiffs and members of the Class.

613.     Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore

unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

614.    Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

615.    Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

616.    Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

617.    Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout New Hampshire; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in New Hampshire.

618.    During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce and consumers.

619.    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

620.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under N.H. Rev. Stat. Ann § 358-A:10.

## O.    NEW MEXICO

621.    Defendants have engaged in unfair methods of competition, or unfair acts or practices, or deceptive acts or practices in violation of N.M. Stat. Ann. §§ 57-12-1, *et seq.* ("Unfair Practices Act").

622.    New Mexico's Unfair Practices Act declares "unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce" unlawful. N.M. Stat. Ann. § 57-12-3.

623.    As alleged herein, Defendants have willingly and knowingly engaged in unfair methods of competition, unconscionable acts or practices, or deceptive acts or practices in violation of New Mexico's Unfair Practices Act.

624.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Class.

625.    The conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M. Stat. Ann. § 57-12-3, in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiffs and the members of the Class and the prices paid by them for Acthar as set forth in N.M. Stat. Ann. § 57-12-2E.

110

626.    Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

627.    Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

628.    Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

629.    Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

630.    Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout New Mexico; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in New Mexico.

631.    During the Class Period, Defendants' illegal conduct substantially affected New

Mexico commerce and consumers.

632.     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

633.     Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under N.M. Stat. Ann. § 57-12-10.

**P.     NEW YORK**

634.     Defendants have engaged in deceptive acts or practices in violation of N.Y. Gen. Bus Law § 349.

635.     N.Y. Gen. Bus. Law § 349 declares "deceptive acts or practices in the conduct of any business, trade or commerce" unlawful.

636.     Defendants made public statements about the prices of Acthar that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for Acthar; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information.

637.     Because of Defendants' unlawful trade practices in the New York, New York Class Members who purchased Acthar were misled to believe that they were paying a fair price for Acthar or the price increases for Acthar were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conspiracy.

638.     Defendants knew that their unlawful trade practices with respect to the pricing of Acthar would have an impact on New York consumers and not just the Defendants' direct customers.

639.     Defendants knew that their unlawful trade practices with respect to pricing Acthar would have a broad impact, causing Class Members who purchased Acthar to be injured by paying more for Acthar than they would have paid in the absence of Defendants' unlawful trade acts and practices.

640.     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of New York in an honest marketplace in which economic activity is conducted in a competitive manner.

641.     Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout New York; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout New York; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in New York.

642.     During the Class Period, Defendants' illegal conduct substantially affected New York commerce and consumers.

643.     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

644.     Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under N.Y. Gen. Bus Law § 349.

## Q.     NORTH DAKOTA

645.     Defendants have engaged in p deceptive acts or practices in violation of N.D. Cent. Code. Ann. §§ 51-15-01, *et seq.*

646.     N.D. Cent. Code. Ann. § 51-15-02 declares "the act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation" unlawful.

647.     Defendants, Plaintiffs, and Class Members are "persons" within the meaning of N.D. Cent. Code. Ann. § 51-15-01.

648.     As alleged herein, Defendants have willingly and knowingly engaged in unfair methods of competition, unconscionable acts or practices, or deceptive acts or practices in violation of N.D. Cent. Code. Ann. §§ 51-15-01, *et seq*.

649.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in North Dakota and took efforts to conceal their agreements from Plaintiffs and members of the Class.

650.     Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

651.     Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

652. Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

653. Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

654. Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout North Dakota; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in North Dakota.

655. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce and consumers.

656. As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

657. Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under N.D. Cent. Code. Ann. § 51-15-09.

R.    PENNSYLVANIA

658. Defendants have engaged in unfair methods of competition, or unfair acts or

115

practices, or deceptive acts or practices in violation of 73 Pa. Stat. Ann. §§ 201-2, *et seq.* ("Unfair Trade Practices and Consumer Protection Law").

659.    The Unfair Trade Practices and Consumer Protection Law declares unfair methods of competition and unfair or deceptive acts or practices illegal, including but not limited to, "engaging in any fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Stat. Ann. §§ 201-2 and 201-3.

660.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of 73 Pa. Stat. Ann. § 201-2.

661.    As alleged herein, Defendants have willingly and knowingly engaged in unfair methods of competition, unconscionable acts or practices, or deceptive acts or practices in violation of the Unfair Trade Practices and Consumer Protection Law.

662.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in Pennsylvania and took efforts to conceal their agreements from Plaintiffs and members of the Class.

663.    Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

664.    Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

116

665.    Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

666.    Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

667.    Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout Pennsylvania; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout Pennsylvania; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in Pennsylvania.

668.    During the Class Period, Defendants' illegal conduct substantially affected Pennsylvania commerce and consumers.

669.    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

670.    Plaintiffs' Assignor, ConnectiCare, paid $169,669.40 for Acthar prescriptions that were delivered to its beneficiaries through Walgreens Specialty Pharmacy located in Pittsburgh, Pennsylvania.[37]

---

[37] Plaintiffs were able to identify Walgreens Specialty Pharmacy using the NPI number.

671.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under 73 Pa. Stat. Ann. §§ 201-4.1 and 201-9.2.

## S.    SOUTH DAKOTA

672.    Defendants have engaged in deceptive acts or practices in violation of S.D. Codified Laws §§ 37-24-1, *et seq.*

673.    S.D. Codified Laws § 37-24-6 declares that it is a deceptive act or practice to "knowingly act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby."

674.    Defendants, Plaintiffs, and Class Members are "persons" within the meaning of S.D. Codified Laws § 37-1-1.

675.    As alleged herein, Defendants have willingly and knowingly engaged in unfair methods of competition, unconscionable acts or practices, or deceptive acts or practices in violation of S.D. Codified Laws §§ 37-24-1, *et seq.*

676.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in South Dakota and took efforts to conceal their agreements from Plaintiffs and members of the Class.

677.    Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower

118

price.

678.    Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

679.    Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

680.    Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

681.    Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout South Dakota; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in South Dakota.

682.    During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce and consumers.

683.    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

684.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under S.D. Codified Laws §§ 37-24-31 and 37-24-32.

**T.    WISCONSIN**

685.    Defendants have engaged in unfair methods of competition, or unfair acts or practices, or deceptive acts or practices in violation of Wis. Stat. §§ 100.18, *et seq*.

686.    Wis. Stat. § 100.20 prohibits "unfair methods of competition in business and unfair trade practices."

687.    As alleged herein, Defendants have willingly and knowingly engaged in unfair methods of competition, unconscionable acts or practices, or deceptive acts or practices in violation of Wis. Stat. §§ 100.18, *et seq*.

688.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Acthar was sold, distributed or obtained in Wisconsin and took efforts to conceal their agreements from Plaintiffs and members of the Class.

689.    Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Acthar. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

690.    Moreover, Plaintiffs lacked any meaningful choice in purchasing Acthar because it was unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiffs could avoid the overcharges.

691.    Defendants' conduct regarding sales of Acthar, including their illegal conspiracy to

secretly fix the price of Acthar at anti-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.

692.    Defendants took grossly unfair advantage of Plaintiffs. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for Acthar.

693.    Defendants' unlawful conduct had the following effects: (1) Acthar price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Acthar prices were raised, fixed, maintained, and stabilized at artificially elevated levels throughout Wisconsin; (3) Plaintiffs and the members of the Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Class paid anti-competitive, artificially inflated prices for Acthar, including in Wisconsin.

694.    During the Class Period, Defendants' illegal conduct substantially affected Wisconsin commerce and consumers.

695.    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiffs and the members of the Class have been injured in their business and property and are threatened with further injury.

696.    Accordingly, Plaintiffs and other similarly situated payers in the Class seek all forms of relief available under Wis. Stat. §§ 100.20 and 100.25.

## JURY DEMAND

Plaintiffs and the Class demand a trial by jury of all issues so triable in this cause.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class described herein, pray for the following relief:

a. Certify this case as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3);

b. Designate Plaintiffs as representatives for the respective Class and Plaintiffs' undersigned counsel as Class Counsel for the respective Class;

c. Enter a judgment against Defendants for the violations alleged herein;

d. Enjoin and restrain Defendants, their affiliates, assignees, subsidiaries, successors, and transferees, and their officers, directors, partners, agents and employees, and all other persons acting or claiming to act on their behalf or in concert with them, from continuing to engage in any anti-competitive conduct and from adopting in the future any practice, plan, program, or device having a similar purpose or effect to the anti-competitive practices set forth above;

e. Award to Plaintiffs and Class Members actual damages incurred as a result of the wrongful acts complaint of herein, along with pre-judgment and post-judgment interest at the maximum rate allowed by law;

f. Award statutory damages set forth herein under the statutory claims alleged;

g. Award Plaintiffs the costs of this action, including reasonable attorneys' fees;

h. Grant Plaintiffs and Class Members alleged herein such other and further relief as the Court deems just and proper.

DATED:        April 10, 2019                    Respectfully submitted by,

                                                */s/ David M. Hundley*
                                                David M. Hundley
                                                PENDLEY, BAUDIN & COFFIN, LLP
                                                2505 Energy Center
                                                1100 Poydras St.
                                                New Orleans, LA 70163
                                                Phone: (504) 355-0086
                                                Fax: (504) 249-5459
                                                dhundley@pbclawfirm.com


                                                R. Brent Wisner
                                                Adam M. Foster
                                                Pedram Esfandiary
                                                BAUM HEDLUND ARISTEI
                                                & GOLDMAN, P.C.
                                                12100 Wilshire Blvd., Ste. 950
                                                Phone: (310) 207-3233
                                                Fax: (310) 820-7444
                                                rbwisner@baumhedlundlaw.com
                                                afoster@baumhedlundlaw.com
                                                pesfiandiary@baumhedlundlaw.com

                                                *Attorneys for Plaintiffs*